IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No.: 12-CV-2632** |
| | ) | **(PAE)** |
| | ) | |
| -against- | ) | |
| | ) | |
| INDIAN HARBOR INSURANCE CO. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STIPULATION OF UNDISPUTED FACTS

In accordance with the Court's May 9, 2013 Order, Plaintiff Scottsdale Insurance Company ("Scottsdale") and Defendant Indian Harbor Insurance Company ("Indian Harbor") submit this joint stipulation of facts for the purposes of their respective summary judgment motions pursuant to F.R.C.P. 56, and not for any other purpose including trial. Scottsdale and Indian Harbor stipulate below to the facts as to which there is no genuine dispute. Scottsdale and Indian Harbor do not stipulate that the facts set forth herein are relevant or material to any legal issue that either of them may present to the Court for consideration.

### A.     The Indian Harbor and Scottsdale Policies

1.     Indian Harbor issued a primary commercial general liability insurance policy to Cole Partners, Inc. ("Cole Partners") under policy number ESG0022377 for the policy period of March 1, 2007 to March 1, 2008 (the "Indian Harbor Policy"). (IHAR 00000757-00000827, Ex. "1".)

2.     The Indian Harbor Policy has limits of liability of $1,000,000. (Id. at IHAR 00000760.)

1

3.     Pursuant to the terms of the Indian Harbor Policy, Indian Harbor has the right and duty to defend any covered claim or "suit." (Id. at IHAR 00000768.)

4.     Scottsdale issued an excess liability insurance policy to Cole Partners under policy number XLS0040393 for the policy period of March 1, 2007 to March 1, 2008 (the "Scottsdale Policy"). (S-dale 0009-0033, Ex. "2".)

5.     The Scottsdale Policy has a limit of liability of $10,000,000. (Id. at S-dale 0009.)

6.     The Scottsdale Policy provides coverage in excess of the Indian Harbor Policy. (Id.)

## B.     The Underlying Accident

7.     On or about March 12, 2007, Cole Partners entered into a contract with JFK Center Associates, LLC ("JFK") to perform construction work at a project site located in Queens, New York. (S-dale 0182-0213, Ex. "3".)

8.     Cole Partners agreed to provide JFK and the owner of the construction site, Merkel Properties, LLC ("Merkel"), with contractual indemnification for certain kinds of personal injury claims that might materialize in the course of Cole Partners' work at the project site. (Id. at S-dale 0188.)

9.     On November 14, 2007, a Cole Partners employee, Linzy Dickson, sustained a workplace injury while present on the JFK construction site. (Dickson Amended Complaint dated March 29, 2008, ¶ 69, Ex. "4".)

10.    Specifically, Dickson fell approximately 18 feet from a wall while conducting demolition work at the direction of Cole Partners. As a result of the fall,

2

Dickson sustained a Grade III open tibia-fibula fracture of his right leg. (Dickson's May 6, 2008 Verified Bill of Particulars, ¶ 2, Ex. "5".)

### C.    Dickson's Post-Accident Care

11.    Dickson was immediately taken to Mary Immaculate Hospital on the day of his accident and underwent emergency surgery to address his open fracture, including insertion of a metal rod and plates. (Report of Operation, Mary Immaculate Hospital, dated November 14, 2007, Ex. "6"; see also Excerpts of the Deposition Transcript of Linzy Dickson (November 21, 2008), Pgs. 61-65. Ex. "7".)

12.    On November 16, 2007, Dickson underwent a second surgery procedure to remove a plate from his leg, and to clean and close up the wound. (Report of Operation, Mary Immaculate Hospital, dated November 16, 2007, Ex. "8".)

13.    Dickson was discharged from the hospital on November 27, 2007. (Discharge Summary, Mary Immaculate Hospital, signed by Dr. Reginald Manning, at 1, Ex. "9".)

14.    On December 12, 2007, Dickson visited Dr. Laith Jazwari for a follow-up evaluation regarding Dickson's status post tibial nailing.  Dr. Jazwari noted that Dickson had an open tib/fib that needed to be addressed by another doctor.  Dr. Jazwari prescribed physical therapy three times a week and wrote a prescription for a bone stimulator for the leg.  X-rays taken of Dickson's leg showed no evidence of healing.  (December 12, 2007 Report of Dr. Jazwari, at 1 and exhibit thereto, Ex. "10".)

15.    On December 28, 2007, Dr. Jeff J. Mollins, a chiropractor, examined Dickson.  Dickson was complaining of neck pain and low back pain.  Dr. Mollins

diagnosed Dickson with several different cervical conditions and lumbago. (January 3, 2008 Report of Dr. Mollins, Ex. "11".)

16.    On January 25, 2008, Dickson was examined by Dr. Nangia, a board-certified neurologist. Dr. Nangia reported that Dickson was complaining of neck and back pain. He recommended Dickson undergo physical therapy three times a week. (January 25, 2008 Report of Dr. Nangia, Ex. "12".)

17.    Dr. Jazrawi saw Dickson again for a follow-up of his "tib fib open" fracture on February 20, 2008. (February 20, 2008 Report of Dr. Jazrawi, Ex. "10".) Dr. Jazrawi again did not see any evidence of healing at Dickson's fracture site.

18.    An MRI exam of Dickson's spine was taken on April 30, 2008, which revealed disc protrusions, bulges and herniations in Dickson's lumbar and thorasic spinal regions. (Dr. Narayan Paruchuri's MRI Report dated April 30, 2008, Ex. "13".)

19.    On May 7, 2008, Dr. Jazwari examined Dickson in connection with his leg injuries and described his leg condition as "much improved." Dr. Jazwari referred Dickson to Dr. Kenneth Egol for "further evaluation and possible bone grafting" regarding Dickson's leg injury. Dr. Jazrawi otherwise noted that "Repeat x-rays show the [leg] fracture is healing slowly but at this point he does have one area anteriorly which is a potential non-union." (Report on Follow-up Visit, dated May 7, 2008, Ex. "10".)

20.    Several months after his original surgeries, the screws inserted into Dickson's right leg began to loosen and pull away from the bone. On May 14, 2008, Dr. Kenneth Egol, an orthopedic surgeon, recommended Dickson undergo surgery to correct the non-union of the right tibia (the bone fracture in his right leg). (Report of Dr. Egol, dated May 14, 2008, at 2, Ex. "14".)

21.    On May 30, 2008, Dickson underwent surgery by Dr. Egol at NYU Hospital for Joint Diseases to repair the non-union of the right tibia.  The old hardware was removed and new hardware was inserted.  (Operative Report, prepared June 2, 2008, Ex. "15".)

22.    On August 14, 2008, Dr. Alan J. Zimmerman, an orthopedic surgeon, conducted an independent medical examination of Dickson.  (Report dated August 14, 2008, Ex. "16".)

23.    In his August 14, 2008 report, Dr. Zimmerman concluded: "[C]laimant has moderate disability and is able to work in a sedentary type, light duty position with restrictions of limited standing/walking, no lifting or carrying and no climbing, kneeling or squatting." (Id. at pg. 4.)  In his report, Dr. Zimmerman indicated he had reviewed several medical records, including Doshi Diagnostic's April 30, 2008 MRI report. (See Ex. "13".) That report revealed disc protrusions, bulges and herniations in Dickson's lumbar and thorasic spinal regions. (Ex. "16", pg. 3.)

24.    On August 20, 2008, Dickson was examined in a follow-up visit by Dr. Egol.  Dr. Egol reported that Mr. Dickson's leg wounds are "well healed, but Dickson still has some pain in his leg." (Report entitled "Follow-Up: Dickson, Linzy," dated August 20, 2008, Ex. "14".)

25.    On October 29, 2008, Dickson had another follow up visit with Dr. Egol. Dr. Egol reported that the leg wounds are "well healed" but notes that the patient still has "some pain with weightbearing." (Report dated October 29, 2008, Ex. "14".)

26.    On November 21, 2008, Dickson was deposed in the Dickson lawsuit. Defense counsel summarized parts of that testimony in his June 16, 2009 report, as noted in paragraphs 88 through 91 and 93 below.

27.    Also on November 21, 2008, Plaintiff's counsel served a Verified Bill of Particulars.  (IHAR 00000418-0000426, Ex. "5".)

28.    On November 26, 2008, Dickson visited Dr. Egol for another follow-up.  Dr. Egol noted that Dickson was "still using a cane and has some difficulty up and down steps. His pain is much, much better."  The doctor states further: "The patient is healed, full weightbearing.  I do not think he is ready to return to work yet." (Follow-up Report dated November 26, 2008, Ex. "14".)

29.    From approximately December 2008 to approximately the beginning of May 2009, Dickson was imprisoned for violating the terms of his parole.  (Deposition Exhibit 4 marked in the Deposition of Bryan Schwartz (January 24, 2013), Ex. "17".)

30.    On May 7, 2009, Dr. Edward Toriello, an orthopedic surgeon, conducted an independent medical examination of Dickson at the request of defendant JFK.  (IHAR 00000373-00000377, Ex. "18".)

31.    Dr. Toriello reviewed Dickson's prior medical records and also examined him.  Dr. Toriello reported that Dickson had suffered from a broken leg requiring surgery and was currently complaining of "low back and neck pain."  (Id. at IHAR 000000373.)

32.    In his report, Dr. Toriello determined that there was a normal range of motion in the cervical and lumbosacral spine, shoulders, hands, wrist, knees and ankles. (Id. at IHAR 00000374-00000376.)

33.    In his report, Dr. Toriello concluded:

> The claimant reveals evidence of a resolved cervical hyperextension injury, resolved low back strain and resolved right tibia and fibula fracture.
>
> The claimant reveals no evidence of disability from any Orthopaedic injury sustained in the accident.  I feel he is presently able to perform the duties of his occupation.

> Based on the history as given by the claimant, review of records and the physical examination, the injuries appear to be causally related to the accident.

(Id. at IHAR 00000376.)

34.    On May 18, 2009, Dr. Richard Lechtenberg, a neurologist retained by defendants JFK and Merkel, issued a report of his findings after performing an independent medical examination of Dickson.  (IHAR 00000368-00000372, Ex. "19".)

35.    Dr. Lechtenberg examined Dickson on May 13, 2009 in connection with preparing his report. (Id. at IHAR 00000368.)

36.    In addition to examining Dickson, Dr. Lechtenberg reviewed Dickson's prior medical records, his deposition transcript, and the verified bill of particulars. (Id. at IHAR 00000368-00000369.)

37.    In his report, Dr. Lechtenberg noted that although Dickson "was walking with a cane, [he] could walk without it." (Id. at IHAR 00000370.)

38.    In his report, Dr. Lechtenberg stated: "My impression is that this man sustained a fracture of his right leg.  There were no associated neurologic deficits that require further attention." (Id. at IHAR 00000371.)

39.    Dr. Lechtenberg also stated: "The report of the MRI of the lumbar spine from 4/30/08 describes disc protrusion at L5/S1 and L3/L4 and disc bulging at L4/L5. There were no objective, neurologic deficits correlating with these reported findings. The Verified Bill of Particulars alludes to injuries [of the leg] and to the cervical spine and spinal roots.  The fracture of the leg is well-documented.  There are no objective, neurologic deficits to substantiate the other claims.  From a neurologic standpoint he is not disabled." (Id.)

40.    On May 26, 2009, Rosalind R. Zuger, a vocational rehabilitation specialist, issued her report of an examination she conducted at the request of defendant JFK. (IHAR 00000364-00000367, Ex. "20".)

41.    Ms. Zuger reported that Dickson had worked in a variety of demolition jobs for 28 years. She also noted that Dickson had been receiving worker's compensation benefits in the sum of $400 per month. (Id. at IHAR 00000364-00000365.)

42.    After administering a variety of tests, Ms. Zuger determined that Dickson's IQ was at 69, which is categorized as "Extremely Low." (Id.) In her report, Ms. Zuger concluded: "Mr. Dickson can become a competitive employment candidate with certain necessary items in place. For example, he is eligible for vocational services provided by the State Rehabilitation Agency[, such as] improving reading and math, training and job placement, free of charge. By his own account he is very fond of animals . . . [and] could work for a pet store . . or the ASPCA . . . which carries a salary of $30,000/year." (Id. at IHAR 00000367.)

43.    Ms. Zuger also concluded that Dickson "presented as personable, communicative, and cooperative. He related easily to a stranger. For the most part he was able to understand the test instructions and follow through. His wish to discontinue the WRAT subtests was, I believe, because of his inability to tackle them as they increased in complexity. He has a good work history and indicated a desire to return to work. He also expressed that he was experiencing pain both in his right leg and right lower back." (Id. at IHAR 00000366.)

44.    On April 9, 2010, Dr. Stephen Wilson, one of Plaintiff's physicians, conducted a physical examination of Dickson. There is no contemporaneous report of that examination.

45.    On June 29, 2010, Dr. Charles Totero, an orthopedist retained by the workers' compensation carrier, conducted an independent medical examination of Dickson. He examined Dickson and reviewed his medical records to date. (Letter Report dated June 29, 2010 to New York Compensation Managers, annexed to Plaintiff's Medical Exchange, dated March 4, 2011, Ex. "21".)

46.    Dr. Totero reported that the Dickson was currently complaining of "lower back pain radiating down into the right greater than left buttocks. He [also] has right leg pain and weakness." (Ex. "21", Totero Letter (June 29, 2010), pg. 2.)

47.    Dr. Totero stated, under the heading "Causal Relationship:"

> The right tibia fracture is causally related to this file. I believe that an aggravation of the pre-existing degenerative condition of the lumbar spine also occurred on 11/14/07. The MRI findings [of April 30, 2008 showing disc protrusion] clearly predated the incident date of this file, but I believe that the injury of 11/14/07 caused an aggravation of these pre-existing conditions.

(Id. at pg. 4.)

48.    On September 24, 2010, Dr. Wilson conducted another physical examination of Dickson. There is no contemporaneous report of that examination.

49.    On November 9, 2010, Dr. Totero conducted a second independent medical examination of Dickson. (Letter Report dated November 9, 2010 to New York Compensation Managers, annexed to Plaintiff's Medical Exchange, dated March 4, 2011, Ex. "21.")

50.    In his report, Dr. Totero stated, under the heading "Diagnosis:"

1. Right compound tib-fib fracture, status post ORIF, status post nonunion, status post repair nonunion with repeat tibial rodding and healing.
2. Lumbosacral sprain with aggravation of pre-existing degenerative lumbar disease.

(Ex. "21", Totero Letter (November 9, 2010), pg. 2.)

51.    Under the heading "Appropriate Treatment and Frequency," Dr. Totero stated:

> The claimant is at MMI for the right leg/tib-fib fracture. No further treatment and/or diagnosis is required. He requires four to six weeks of physical therapy to the low back at a frequency of two to three times per week. If symptoms persist, three epidural steroid injections should be attempted. I do not believe that the claimant is a surgical candidate for the lumbar spine at this time.

(Id. at pg. 3)

52.    On November 16, 19 and 23, 2010, Dickson received "trigger point injections" from his treating physician, Dr. Stephen Wilson. (See Injection Procedure Notes, Ex. "22".)  In the Trigger Point Injection Procedures Notes, Dr. Wilson prepared after administering the injections, Dr. Wilson stated:

> The patient has myofascial trigger points that are areas of hyperirritability in the muscle or fascia that is symptomatic with respect to pain. It refers a pattern of pain at rest or on motion that is specific for the muscle. The patient has presented with increased pain on active and passive [range of motion] additionally there is pain on contraction of the muscle. Pain upon digital pressure to the trigger point site with a "jump sign" and muscle weakness noted. The patient's trigger point has been unresponsive to previous conservative therapy. It is felt that the patient will benefit from these trigger point injections.

53.    On January 14, 2011, Dr. Wilson issued his Final Report addressed to Plaintiff's counsel. (See Report dated January 14, 2011, annexed to Plaintiff's Medical Exchange, dated February 8, 2011, Ex. "23".)

54.     Dr. Wilson's Final Report references two physical examinations Dr. Wilson had conducted of Dickson, one on April 9, 2010 and one on September 24, 2010, as well as various medical records.  (Ex. "23".)

55.     In his January 14, 2011 report, Dr. Wilson stated his view as follows:

Prognosis and Future Medical

It is my professional opinion, to a reasonable degree of medical certainty, that Mr. Linzy Dickson has suffered serious and significant injury as a result of the accident of 11/14/07 which is the competent producing cause of his injuries.

Injury to the right lower extremity was further complicated by non-union at the tibial fracture site thereby requiring the patient to undergo a third operation on the extremity which was, removal of hardware and repair of the non-union....

This injury and it's subsequent complications have resulted in a moderate-severe, permanent gait dysfunction in this patient.  He currently can walk no more than 1 ½ blocks without a rapid increase in the right lower extremity pain.  He cannot ascend or descend stairs comfortably and avoids them.  He is unable to run.  Decreases in barometric pressure result in increased pain in the extremity from the knee distally.  Also, the patient has had frequent skin breakdown over the central to medial aspect of the right lower extremity in the proximal third.  This repeatedly predisposes the patient to infection in the injured leg.

In addition to functional aspects of his right lower extremity disability, the patient continues to complain of "numbness" in the right leg from approximately mid-calf and down, and "popping" at the knee and ankle wich is painful.
. . .
It is my professional opinion that due to the permanent bony changes that have resulted from the fracture, and insertion of hardware to stabilize it, that this patient's condition will continue to get worse and will result in accelerated deteriation of articular cartilage lining both the knee and ankle joints.
...
. . . As the body adjusts to an altered gait pattern via muscular compensation in the lower extremities and lumbar spine, it is highly likely, to a reasonable degree of medical certainly, that the lower extremity condition will exacerbate the spinal condition.  In fact, as the right lower extremity

> condition has improved since the date of injury, the lumbar spinal condition has gotten worse.
>
> It is my professional opinion that this patient's impairments have resulted in total and permanent disability, and further, that his future medical care will require courses of intermittent physical therapy, spinal injections, surgery to remove hardware and/or spinal surgery.

(Ex. "23", Wilson Final Report, pgs. 6-7.)

56.     On January 20, 2011, Dr. Leonard Harrison, an Orthopedist whom Dickson had designated as one of his experts, examined Dickson and, on February 10, 2011, issued a report. (See Report dated February 10, 2011, contained in Plaintiff's Expert Exchange Pursuant to CPLR 3101(d)), dated February 14, 2011, Ex. "24".)

57.     In his report, Dr. Harrison stated:

> The patient's hip pain is not in the vicinity of where the aspiration was taken for the bone graft. Examination of the pelvis was within normal limits. The right hip pain appears reactive to the limping caused by the tibial fracture. In addition the low back problem appears to have been aggravated by the tibial condition which included limping and pain.
>
> When seen on 1/20/11, related to his accident of 11/14/07, the patient had a significant partial permanent disability of the right lower extremity largely due to the fracture of the right tibia, the subsequent necessary surgeries and the sequelae. A great deal of soft tissue scarring has occurred. The patient had for a period of time a delayed union which necessitated Dr. Egol's second surgery which included bone grafting.
>
> No further improvement is to be expected.
>
> The patient will not return to any heavy type work or be able to do any work which involves any prolonged standing. The patient should take indicated medication. Some period physiotherapy may provide some comfort. The patient's low back conditions appears largely related to a pre-existing condition which was aggravated by the accident.

(Ex. "24", Harrison Report, pg. 6.)

**D.     Dickson Commences Suit and Notice to Indian Harbor**

58.     Following his accident, Dickson filed a complaint on December 3, 2007 against Merkel in New York State Supreme Court, Kings County. (Ex. "4".)

59.     JFK was added as a defendant to Dickson's lawsuit in the beginning of 2008. (Ex. "4".)

60.     In his complaint, Dickson alleged that JFK and Merkel were strictly liable for the injuries he sustained as a result of his November 14, 2007 accident under various sections of New York's Labor Law. (Ex. "4", ¶ 69.)

61.     By letter dated July 31, 2008, Merkel and JFK demanded Cole Partners and Indian Harbor assume the defense and indemnification of the Dickson Action based upon the provisions in the contract they had with Cole. (IHAR 00000503. Ex. "25".)

62.     JFK and Merkel subsequently filed a third-party complaint against Cole Partners on August 11, 2008 seeking contractual indemnification, common law indemnification and contribution. (IHAR 00000098-00000101), Ex. "26".)

63.     On or about August 22, 2008, Cole Partners' broker provided notice of Dickson's lawsuit and the JFK/Merkel third party action to Indian Harbor (IHAR 00000093-00000114, Ex. "27".)

64.     Thereafter, Indian Harbor assigned one of its claim handlers, Patricia "Trish" Evans to handle Dickson's claim. (Excerpts of the Deposition Transcript of Patricia Evans, dated March 14, 2013, Pg. 86, Ex. "28".)

65.     By letter dated October 2, 2008, Indian Harbor denied Merkel's and JFK's tender on the stated grounds that there was no evidence to show that the insured was negligent in its work, and that while the contract required the insured to purchase liability

13

insurance for the project, it was not required to name the owner as an additional insured. (IHAR 00000074-00000079, Ex. "29".)

66.     In an October 15, 2008 file note entry, Dean Clause of Scottsdale reported that he had had a telephone conversation with Evans in which she told Clause that "her initial impression is that [this] case does not pose reasonable potential for exposure beyond primary policy limit." (Excerpts of Dean Clause's File Notes, S-dale II, et. Seq. 91-92, Ex. "30".)

67.     By letter dated October 15, 2008 to Evans, Dean Clause requested copies of Wilson Elser's reports.  Clause also inquired as to whether Indian Harbor had taken any coverage positions.  (IHAR 00000439-0000040, Ex. "31".)

68.     By letter dated November 12, 2008, Indian Harbor advised Cole Partners that it had retained Wilson Elser to defend Cole in the underlying action and otherwise reserved all of its rights. (IHAR 0000067-0000073, Ex. "32".)

69.     Two attorneys at Wilson Elser and subsequently Lewis, Brisbois, Bisgaard & Smith, LLP ("Lewis Brisbois") responsible for the defense of the Dickson case were Gregory Katz and Bryan Schwartz.  Schwartz had day-to-day responsibility for the defense of the Dickson case. (Excerpts of the Deposition Transcript of Bryan Schwartz, Pg. 49, Ex. "33".)

70.     Indian Harbor had previously utilized Wilson Elser in the defense of other claims against Cole Partners. (IHAR 00000460, Ex. "34".)

E.     **The Handling and Defense of the Underlying Action**

71.     By e-mail dated January 21, 2009, Evans advised Clause that she had instructed Wilson Elser to copy Scottsdale on all reports they sent to Indian Harbor.  She

14

also attached a copy of the reservation of rights letter she had sent to Cole Partners on November 12, 2008. (IHAR 00000437, Ex. "35".)

72.    By separate e-mail that same day to Katz, copied to Clause, Evans asked for a copy of Wilson Elser's initial status report, which she had not yet received. Evans asked that all reports be copied to Clause, and she provided defense counsel with Scottsdale's address. (IHAR 00000436, Ex. "36".)

73.    Wilson Elser sent its initial report to Trish Evans, copied to Scottsdale, on January 22, 2009. (IHAR 00000409-00000417, Ex. "37".) Wilson Elser reported that they had filed an answer to the third-party complaint and had received a Verified Bill of Particulars, dated November 21, 2008, from Dickson's counsel. They attached both to their report.

74.    In its initial report, which was based on limited information, Wilson Elser listed Dickson's injuries as "Right Grade III tibia-fibula fracture with open reduction and internal fixation; subsequent irrigation and debridement; severe disfiguring and scarring; lumbar and cervical spine injuries." (Id. at pg. 1.) Wilson Elser noted that Dickson claimed $35,000 in lost earnings and $1.5 million in future lost earnings. (Id. at pg. 6.)

75.    Wilson Elser summarized Dickson's injuries from his Verified Bill of Particulars, which was signed and verified by his lawyer. The Bill of Particulars, stated that the "following injuries were caused, sustained, exacerbated, precipitated, and/or sustained" by Dickson's accident:

- Open proximal tiba-fibula fracture, grade III requiring open reduction internal fixation and intermedullary nailing of the right tibial;
- Status post irrigation and debridement intermedullary fixation and plating of the open right tibial fracture, requiring repeat irrigation and

15

debridement and removal of tibial place and delayed primary closure of wound;
- Necessity to undergo further ankle surgery to address scar tissue and non-union;
- Severe disfiguring scarring, right leg;
- Cervicobrachial neuritis;
- Cervical and lumbar radiculopathy;
- Cervical and lumbar myofascitis;
- Cervical and lumbar spine strain/strain;
- Cervical and lumbar spine derangement;
- Loss of mobility, right leg;
- Loss of use, right leg;
- Severe physical pain and suffering;
- Severe emotional pain and suffering;

(Id. at pg. 3; see also Dickson's Verified Bill of Particulars (November 21, 2008), ¶ 21, IHAR 00000422, Ex. "5".)

76.    Wilson Elser also stated in its initial report that "liability" for Cole Partners was "questionable to unfavorable." (Ex. "37", pgs. 1 and 4.)  Wilson Elser's initial report explained that "[Dickson's] accident occurred while [Dickson's] boss pulled a portion of the frame of the building down with the excavator, causing a chain reaction.  The connection to the other frames snapped causing two frames (one of which the plaintiff was standing upon) to fall." (Id. at pg. 2.)  As such, Wilson Elser concluded, "It appears that [Cole Partners] caused [Dickson's] accident, and would be found liable under Labor Law §240(1)." (Id. at pg. 5.)

77.    After noting that they were not in possession of all the pertinent documentation, Wilson Elser provided a preliminary assessment of exposure "in the $350,000-$500,000 range" based upon Dickson's prior surgeries, lost earnings claim "(and considering that this case is venued in Kings County)." (Id. at pg. 6.)

78.    In response to the receipt of Wilson Elser's initial report, Trish Evans arranged to "Committee" the case with her colleagues to decide upon a reserve

16

recommendation.  (Excerpts of Trish Evans' Claim Notes, IHAR 00000737, Ex. "38"; Evans, Pg. 116, lns. 5-10, Ex. "28".)

79.    By e-mail dated February 24, 2009, Evans advised Cole Partners' broker that liability in the Dickson Action was probable and that defense counsel had estimated exposure in the $350k-$500k range.  Because Indian Harbor had at present only a $10,000 indemnity reserve, Evans would be "roundtabling this case within the next few weeks and expect[ed] the reserve will be increased significantly." (IHAR 00000396, Ex. "39".)

80.    By e-mail dated March 2, 2009, Evans stated that the "Committee scheduling has been heavy lately," but asked Indian Harbor to schedule a committee for the "first available date." (IHAR 00000398, Ex. "40".)

81.    The Committee met on or about March 11, 2009. (IHAR 00000736, Ex. "38"; Evans, Pg. 119, Ex. "28".)

82.    The Committee members assessed a total exposure in Dickson's case ranging from $400,000 to $850,000. (IHAR 000000063-00000066, Ex. "41", at IHAR 00000065; Evans, Pgs. 123-128, Ex. "28".)

83.    The Committee decided to increase the $10,000 indemnity reserve to $500,000. (IHAR 00000736, Ex. "38".)

84.    Evans could not recall why the indemnity reserve was not increased in response to the Committee's decision until one year later. (Evans, Pg. 131, lns. 14-17, Ex. "28".)

85.    On June 16, 2009, defense counsel provided a further written report on the Dickson Action to Indian Harbor, copied to Scottsdale. (IHAR 0000382-0000391, Ex. "42".)

17

86.    Wilson Elser reported that they had now met with Cole Partners' owner, Marlon Cole, and had reviewed Dickson's deposition testimony from November 21, 2008, as well as his November 21, 2008 Bill of Particulars. (Id. at pgs. 1-2.)

87.    Based on their review of the deposition transcript, Wilson Elser reported that Dickson had completed the 11th grade and had been a demolition worker since at least 1994. He was not married and paid child support. (Id. at pgs. 2-5)

88.    Wilson Elser reported further that Dickson testified that he had surgery to his right knee and ankle and was in the hospital for eighteen days. A soft cast was applied and remained on his leg for six months. It was discovered that the screws were backing out of his ankle, so in May 2008, Dr. Egol performed surgery to change the hardware. Following that procedure, Dickson was given an ace bandage and a bone stimulator. (Id. at pg. 4.)

89.    Wilson Elser reported further that Dickson testified that as of November 21, 2008, Dickson had been undergoing physical therapy twice a week for approximately six months. He received therapy to his back, neck and both shoulders. (Id.)

90.    Dickson testified further that, as of his deposition in November 2008, the bone had not mended, and he was walking with a limp and had a cane. Dickson testified that he had pain in his neck and numbness in his toes. Dickson said he needed sleeping pills and Benadryl to sleep and that he was taking Vycodin daily. Dickson said he had not injured his right leg, back or neck prior to or after the accident. (Id. at pg. 5)

91.    Wilson Elser also reported that JFK and Merkel had filed a motion to compel Dickson to appear for physical examinations, because he had failed to appear on two prior occasions. (Id. at pgs. 1-2.)

92.    As to liability, defense counsel reported that Dickson testified that he was never provided with safety harnesses during the time he worked at the site. He testified that he had asked for one from his supervisor but never received it. (Id. at pg. 3).

93.    Wilson Elser maintained their position that liability was "unfavorable." (Id. at pg. 6.)

94.    Wilson Elser further increased their estimated exposure to "$600,000-750,000+" and noted, "it is expected that [Dickson] will not be able to return to work as a laborer." (Id. at pg. 6.)

95.    Wilson Elser also recommended that Indian Harbor accept the tender of defense that had been demanded by JFK and Merkel on the ground that JFK's and Merkel's liability would pass through to Cole Partners in the third-party action. (Id. at pgs. 1, 5.)

96.    In a file notes entry dated June 17, 2009, Evans agreed with Wilson Elser's recommendation that Indian Harbor assume the defense of JFK and Merkel. (IHAR 00000736, Ex. "38".)

97.    Evans further stated in the same note that another committee meeting would be held to address Wilson Elser's assessment of exposure in the "$600,000-$750,000+" range. (Id.)

98.    On July 28, 2009, Evans' manager, Nicholas Cordaro followed up with Evans to Committee Dickson's case. (IHAR 00000735, Ex. "38".)

99.    On September 21, 2009, Indian Harbor agreed to assume the defense of JFK and Merkel. (Ex. "43".)

100.    On October 24, 2009 Cordaro again followed up with Evans to Committee the Dickson case "soon." (IHAR 00000735, Ex "38".)

101.    On January 24, 2010, Cordaro once more followed up with Evans to Committee the Dickson case. (Id.)

102.    On February 4, 2010, Katz and Schwartz provided a further written report about the Dickson lawsuit to Indian Harbor, copied to Scottsdale. (IHAR 00000358-00000377, Ex. "44".)

103.    Defense counsel reported that they had just recently received a copy of the files of JFK's and Merkel's prior defense counsel. (Id. at pg. 1.)

104.    Among the materials defense counsel had received were the reports of the independent medical examinations previously conducted by Dr. Toriello and Dr. Lechtenberg and the report of Ms. Zuger summarized above in paragraphs 40 through 43.

105.    Defense counsel summarized the findings of Dr. Toriello, Dr. Lechtenberg, and Ms. Zuger, and also attached copies of the reports. (Id. at pg. 2-3.)

106.    In his February 4 report, defense counsel repeated that Mr. Dickson had suffered a broken leg requiring multiple surgeries, and that he claimed to have been incapacitated since the time of the accident, and claims $35,000 in lost earnings and $1.5 million in future lost earnings. Defense counsel noted that Mr. Dickson had been earning about $37,000 a year as a laborer. (Id. at pgs. 4-5.)

107.    Defense counsel concluded:

> Based upon the information we have (and considering that this case is venued in Kings County), this case appears to have exposure in the $750,000+ range, based upon the surgeries and the loss of earnings claim. Both examining physicians opined that plaintiff has fully recovered from his injuries, and Dr. Toriello stated that plaintiff is able to return to work.

20

(Id. at pg. 5.)

108.    On March 10, 2010, in light of defense counsel's February exposure evaluation, Evans prepared a Large Loss Report ("LLR"), requesting an increase in the reserve to $750,000 in indemnity and $100,000 in expense. (IHAR 00000347-00000350, Ex. "45").

109.    In her LLR, under "Current Status and Resolution Strategy," Evans stated:

> Depositions are taking place and our insured will be produced for his deposition shortly. Upon completion of all depositions, discovery and receipt of all medical reports, it is my intent to settle the case.

(Id. at IHAR 00000349.)

110.    Nicholas Cordaro approved Evans' request for a $750,000 loss reserve on or about March 5, 2010. (IHAR 00000734, Ex. "38".)

**F.    Dickson Obtains Summary Judgment on Liability**

111.    Dickson moved for summary judgment on his Labor Law causes of action in or about April of 2010. (IHAR 0000262-0000266, Ex. "46", at pg. 2.)

112.    By e-mail dated April 30, 2010, defense counsel provided a further written report about the Dickson action, dated April 28, 2010, to Indian Harbor, copied to Scottsdale. (Id. at IHAR 00000262-00000266.)

113.    In their April 28, 2010 report, Wilson Elser maintained their position that liability was unfavorable, but also cited inconsistencies in testimony provided by Marlon Cole and one of Cole Partners' former employees, Joseph Dunston, as potential grounds to defeat Dickson's motion. (Id. at pg. 1-3.)

114.    The April 28, 2010 report indicates that Dickson's counsel made a settlement demand of $2,000,000. (Id. at pg. 1.)

21

115.    Wilson Elser also recommended conducting video surveillance of Dickson. (Id. at pg. 4.)

116.    The Wilson Elser attorney handling Cole Partners' defense on a day-to-day level, Bryan Schwartz, testified that the purpose of surveillance was to see what Dickson acted like when he did not think anyone was watching. (Schwartz, Pg. 42, lns. 3-5, Ex. "33".)

117.    On May 12, 2010, Evans spoke to Schwartz and gave him authority to conduct two to three days of surveillance on Dickson. (IHAR 00000733, Ex. "38".)

118.    Schwartz subsequently reported that his investigator was unable to conduct any surveillance on Dickson because they were unable to locate him. (Lewis Brisbois' August 24, 2010 Report, IHAR 00000158-00000162, pg. 3, Ex. "47".)

119.    After receipt of defense counsel's April 28, 2010 report, Dean Clause stated in his file notes on May 20, 2010 that "it is time to lightly push primary towards beginning negotiations." (Excerpts of Dean Clause's File notes, S-dale II 000100, Ex. "30".)

120.    Thus, on May 20, 2010, Dean Clause sent an e-mail to Bryan Schwartz, copied to Trish Evans, asking:

> What is the outlook on negotiation?  With the Note of Issue and MSJ filed by plaintiff along with the communication of a demand, it seems that plaintiff is telegraphing an interest in moving towards a resolution or a trial. Is there interest in mediation from plaintiff (and [Indian Harbor])?

(S-dale II 000100, Ex. "30"; IHAR 00000323, Ex. "48".)

121.    By e-mail on May 24, 2010, Evans advised Clause as follows:

> We are going to conduct a few days of surveillance and then will probably schedule a mediation.  Waiting for updated report from defense counsel.

(S-dale II 000100-000101, Ex. "30"; IHAR 00000325, Ex. "49".)

122.    In or about May of 2010, Lewis, Brisbois, Bisgaard & Smith, LLP ("Lewis Brisbois") took over the Dickson case with Indian Harbor's approval, when Katz and Schwartz left that firm to join Lewis Brisbois.

123.    On July 6, 2010, defense counsel provided a further written report to Indian Harbor, copied to Scottsdale. (IHAR 00000163-00000169, Ex. "50")

124.    In their July 6, 2010 report, Lewis Brisbois reiterated that Dickson's settlement demand was $2 million, but Dickson's counsel had indicated "he is willing to accept less." (Id. at pg. 1.)

125.    On page 5 of the report, Lewis Brisbois stated that "we also anticipate that [Dickson] will win his motion pursuant to [Labor Law] § 240, and therefore the sole issue, should the case proceed to trial, would be damages only." (Id. at pg. 5.)

126.    Lewis Brisbois also recommended attempting to settle with Dickson for up to $800,000 rather than proceed to trial. (Id. at pg. 5.)

127.    A report from defense counsel dated August 24, 2010 stated that "we would recommend attempting to engage in serious settlement discussions before the date of argument [on Dickson's summary judgment motion and Indian Harbor's cross-motions] which is September 20, 2010." (Ex. "48", pg. 3.)

128.    A report from defense counsel dated August 24, 2010 stated that "we would recommend attempting to engage in serious settlement discussions before the date of argument [on Dickson's summary judgment motion and Indian Harbor's cross-motions] which is September 20, 2010/" (Ex. 48, Pg. 3). The same report also stated, under the heading "Resolution Strategy," that "[p]laintiff is still interested in mediation. Based on the likelihood of success on plaintiff's motion for summary judgment as to [section] 240,

and the injuries sustained, we would recommend attempting to resolve the matter before proceeding to trial." (Id. At pg. 4)

129.    The trial court granted Dickson summary judgment on his Labor Law § 240 cause of action on September 28, 2010. (IHAR 00000157, Ex. "51".)

130.    Lewis Brisbois noted in its report dated September 21, 2010 that there had been no settlement discussions since Dickson made a $2 million demand in or about April of 2010. (IHAR 000001043-000001045, Ex. "52", Pg. 2.)

131.    Lewis Brisbois again stated in this report that they would request $800,000 in settlement authority if Dickson's case proceeded to mediation. (Id. at pg. 3.)

132.    By e-mail dated November 8, 2010, Schwartz advised Evans that he had appeared for a pre-trial conference that day but the Court adjourned the conference to January 19, 2011.  He indicated further that the Plaintiff's attorney suggested mediation. (IHAR 00000142, Ex. "53".)

133.    By e-mail dated November 10, 2010, Evans advised Schwartz that she approved scheduling the mediation.  (IHAR 00000141, Ex. 54".)

134.    By e-mail dated November 18, 2010, Lewis Brisbois provided a further written report, dated November 16, 2010, about the Dickson action to Indian Harbor, copied to Scottsdale.  (IHAR 00000132-00000135, Ex. "55".)

135.    Lewis Brisbois "maintain[ed] the position that should the case proceed to mediation we would request up to $800,000 in settlement authority."  (Id. at pg. 2.)

136.    Evans and Lewis Brisbois have stated that once summary judgment was granted to Dickson, the only issue remaining was damages. (Evans, Pg. 38, lns. 11-17, Ex. "28"; IHAR 00000133, Ex. "55".)

137.    On February 8, 2011, in response to defendant's Demands for Discovery and Inspection, Hecht sent to Lewis Brisbois Dr. Stephen Wilson's January 14, 2011 report referred to in paragraphs 53 through 55 above. (See Plaintiff's Medical Exchange dated February 8, 2011, Ex. "23".)

138.    On February 9, 2011, Hecht also designated Dr. Wilson as one of Plaintiff's testifying experts and again sent Lewis Brisbois a copy of Dr. Wilson's January 14, 2011 report. (See Plaintiff's Expert Exchange Pursuant to CPLR 3101(d), dated February 9, 2011, Ex. "56".)

139.    On February 14, 2011, Hecht designated Dr. Harrison as one of his testifying experts and served Lewis Brisbois with Dr. Leonard Harrison's February 10, 2011 report referred to in paragraphs 56 through 57 above. (See Plaintiff's Expert Exchange Pursuant to CPLR 3101(d)), dated February 14, 2011, Ex. "57".)

140.    On February 15, 2011, in response to defendant's Demands for Discovery and Inspection, Hecht served upon the Lewis Brisbois firm copies of procedure reports for Dickson's three trigger point injections. (See Plaintiff's Medical Exchange dated February 15, 2011, Ex. "58".)

141.    Mediation was scheduled for February 16, 2011. (Schwartz, Pg. 71, ln. 3, Ex. "33".)

142.    In a pre-mediation report dated February 10, 2011, sent to Indian Harbor and copied to Scottsdale, Lewis Brisbois reaffirmed that Dickson's demand was $2 million, which Lewis Brisbois considered to be excessive. However, Lewis Brisbois noted that "[Dickson] has indicated that there is room for significant movement." (IHAR 00000651-00000654, Ex. "59", Pg. 2.)

143.   Lewis Brisbois requested $800,000 in settlement authority for the upcoming mediation, reasoning that while the defendants possessed reports from their retained doctors concluding that Dickson's injuries were healed and he could return to work:

> The fact remains that [Dickson] still walks with a cane three years later. Moreover, while we attempted surveillance, we did not get any good footage of [Dickson]. In addition, the fact that [Dickson's] reading was at a minimal level and his IQ score was 69 (which is considered 'Extremely Low') will be an argument that [Dickson] will make to show that he was well suited to be a laborer."

(Id. at pg. 3.)

144.   Indian Harbor did not extend the requested $800,000 in settlement authority to Lewis Brisbois for the February 16, 2011 mediation. (Evans, Pg. 165, lns. 22-24, Ex. "28".)

145.   Instead, Indian Harbor extended $750,000 in settlement authority to Lewis Brisbois for the mediation. (IHAR 000001289; February 15, 2011 email from Trish Evans to Bryan Schwartz, Ex. "60".)

146.   Cordaro and Evans testified that if Schwartz wanted more settlement authority, he could have asked for authority during the mediation and this was communicated to him before the mediation began. (Excerpts of Deposition Transcript of Nicholas Cordaro, Pg. 54, lns. 16-24; Pg. 58, lns. 5-13, Ex. "61"; Evans, Pg. 183, lns. 20-23, Ex. "28".)

**G.   The February 16, 2011 Mediation**

147.   Mediation took place on February 16, 2011. (Schwartz, Pg. 84, lns. 2-8, Ex. "33"; Excerpts of the Deposition Transcript of Jordan Hecht, Pg. 35, lns. 22-25, Ex. "62".)

148.    Evans did not attend the February 16, 2011 mediation. (Evans, Pg. 172, lns. 14-16, Ex. "28") She gave Schwartz her cell phone number so he could call her during the mediation if he needed to speak with her. (IHAR 00000731, Ex. "38".)

149.    Bryan Schwartz attended the mediation on behalf of the defendants and Jordan Hecht attended on behalf of Dickson. (Hecht, Pg. 19, lns. 4-11, Ex. "62"; Schwartz Pg. 85, lns. 8-9, Ex. "33".)  The mediator was Ms. Ronnie Gallina, Esq. (Hecht, Pg. 19, lns. 4-11, Ex. "62"; Schwartz Pg. 85, lns. 8-9, Ex. "33".)

150.    The February 16 mediation did not result in a settlement.

151.    On March 4, 2011, Hecht sent to Lewis Brisbois a Medical Exchange enclosing a handwritten report of a physical examination conducted by Dr. Gary Thomas and dated February 22, 2011. (Ex. "21".)

152.    On April 13, 2011, Hecht sent to Lewis Brisbois by Medical Exchange a second handwritten report of a physical examination by Dr. Thomas that was conducted on and dated April 1, 2011. (Ex. "63".)

153.    On April 28, 2011, Hecht sent to Lewis Brisbois an Expert Exchange containing a March 30, 2011 report of Dr. David Abramson, a plastic surgeon who proposed measures to address the scarring in Dickson's right leg. (Abramson Report at pg. 2, Ex. "64".)

154.    In On May 4, 2011, Plaintiff sent to Lewis Brisbois an Expert Exchange containing a one-page report from Dr. Harrison of a March 3, 2011 examination of Dickson. (Ex. "65".)  Dr. Harrison stated:

> The patient was reevaluated.  His complaints and my physical findings were the same as noted in my report of February 10, 2011. [T]he change was that [Dickson] complained of a cracking sensation in the low back with

ambulation. The examinations of his injured areas were as noted in the report of 2/10/11.

155.    Under the heading "Plan", Dr. Harrison stated that the "patient was to continue with his treating doctors." (Id.)

**H.    Dickson Undergoes Spinal Fusion Surgery**

156.    On May 6, 2011, plaintiff's physician recommended back surgery. (Report of Dr. Andrew Merola, dated May 6, 2011, Ex. "66".)

157.    One month later – on June 2, 2011- Mr. Dickson underwent spinal fusion back surgery.    (Surgical report of Dr. Merola, dated June 2, 2011, IHAR 00000709-00000711, Ex. "67".)

158.    On June 10, 2011, Hecht served Lewis Brisbois with a Supplemental Bill of Particulars confirming that Dickson had undergone spinal fusion surgery. (Ex. "5".)

**I.    Efforts To Settle the Dickson Action After the Back Surgery**

159.    In a report dated August 4, 2011, Lewis Brisbois advised Indian Harbor and Scottsdale that Dickson served the defendants with the June 10, 2011 Supplemental Bill of Particulars. (IHAR 0000981-0000984, Ex."68", pg. 1.)   Lewis Brisbois attached to its report the June 2, 2011 surgical report of Dr. Merola.  (See Ex. "67".)

160.    Lewis Brisbois stated further:

> Plaintiff's lumbar spine injuries . . . must be further explored in discovery. We have received several additional medical authorizations to allow us to obtain plaintiff's most recent medical treatment records . . . We shall pursue . . . a further deposition of the plaintiff and also require plaintiff to submit to another IME.

(Ex. "68", pg. 4.)

161.    In their next report dated September 22, 2011, Lewis Brisbois indicated that it had conducted a further deposition of Dickson and summarized same in its report (IHAR

28

00001189-00001183, at pgs. 2, 3, Ex. "69".) Lewis Brisbois also indicated that Dickson had undergone a further IME, a report of which Lewis Brisbois had not yet received. (Id. at pg. 2.)

162.    Dickson's case settled on November 4, 2011 for $2.5 million with Indian Harbor paying its $1 million policy and Scottsdale paying $1.5 million. (Ex. "70".)

**J.    Scottsdale's Lawsuit**

163.    On or about February 12, 2012, Scottsdale commenced an action, captioned Scottsdale v. XL, by filing a complaint in New York State Supreme Court, New York County, which was removed to this Court. That complaint was subsequently dismissed on consent of all parties. (Ex. "71".)

164.    On April 5, 2012, Scottsdale filed a complaint in this Court captioned Scottsdale v. Indian Harbor. (Ex. "72".)

165.    On or about July 10, 2012, Indian Harbor filed an answer, denying all the claims that Indian Harbor had acted in bad faith. (Ex. "73".)

Dated:  July 15, 2013

Respectfully submitted,
CARROLL McNULTY & KULL L.L.C.

By: _____
Gary S. Kull (admitted *pro hac vice*)
Joshua C. Weisberg (JW 5081)

570 Lexington Avenue
New York, NY 10022
(212) 252-0004 (Telephone)
(212) 252-0444 (Facsimile)

*Attorneys for Plaintiff*

29

Clyde & Co U.S. LLP

By: _Ralph P DeSanto_

Paul R. Koepff (PK 8452)
Ralph P. DeSanto (RD 4544)

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel.: (212) 710-3900
Fax: (212) 710-3950
E-mail: paul.koepff@clydeco.us

*Attorneys for Defendant*