UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                          :

SCOTTSDALE INSURANCE COMPANY,          :

                         :              12 Civ. 2632 (PAE)

                  Plaintiff,      :

                         :           <u>OPINION & ORDER</u>

           -v-              :

INDIAN HARBOR INSURANCE COMPANY,    :

                         :

                 Defendant.     :

                         :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Scottsdale Insurance Company ("Scottsdale") brings this diversity action against

defendant Indian Harbor Insurance Company ("Indian Harbor").  Scottsdale, the excess insurer

to Cole Partners, Inc. ("Cole"), alleges that Indian Harbor, Cole's primary insurer, acted in bad

faith and with gross disregard to Scottsdale's interests by failing to settle, for an amount within

the $1 million primary insurance policy, a lawsuit brought by Linzy Dickson ("Dickson").

Ultimately, Dickson's lawsuit settled for $2.5 million, which required Scottsdale to pay $1.5

million in excess liability.  Scottsdale now seeks this amount, plus interest, in damages from

Indian Harbor.

      The parties have filed cross-motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  For the reasons that follow, both motions are denied.

## I.      Background[1]

### A.      Mr. Dickson's Underlying Injury and Lawsuit

In March 2007, Cole entered into a contract with JFK Center Associates, LLC ("JFK") to

perform construction work at a project site located in Queens, NY.  JSF ¶ 7.  Cole agreed to

indemnify JFK and the owner of the construction site, Merkel Properties, LLC ("Merkel"),

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of their cross-motions for summary judgment, including:  the Parties' Joint Stipulation of Undisputed Facts ("JSF") (Dkt. 65) and attached exhibits; Plaintiff's Amended Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 68) and attached exhibits; the Amended Declaration of Gary S. Kull in Support of Plaintiff's Motion for Summary Judgment ("Kull Decl.") (Dkt. 67) and attached exhibits; Defendant's Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 73); Defendant's Response to Plaintiff's Local Rule 56.1 Statement ("Def. Resp. 56.1") (Dkt. 74); the Declaration of Ralph DeSanto in Support of Defendant's Cross-Motion for Summary Judgment ("DeSanto Decl.") (Dkt. 71) and attached exhibits; the Declaration of Bryan T. Schwartz in Support of Defendant's Cross-Motion for Summary Judgment ("Schwartz Decl.") (Dkt. 72) and attached exhibits; the Reply Declaration of Gary S. Kull in Opposition to Defendant's Cross-Motion for Summary Judgment ("Kull Rep. Decl.") (Dkt. 75) and attached exhibits; Plaintiff's Response to Defendant's Local Rule 56.1 Statement ("Pl. Resp. 56.1") (Dkt. 78); and the Reply Declaration of Ralph DeSanto in Support of Defendant's Cross-Motion for Summary Judgment ("DeSanto Rep. Decl.") (Dkt. 80) and attached exhibits.  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The following abbreviations are used herein for the parties' memoranda of law:  (1) Plaintiff's Memorandum of Law in Support of the Motion for Summary Judgment ("Pl. Br.") (Dkt. 61); (2) Defendant's Memorandum of Law in Support of the Cross-Motion for Summary Judgment ("Def. Br.") (Dkt 70); (3) Plaintiff's Reply Memorandum of Law in Support of the Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl. Rep. Br.") (Dkt. 77); and (4) Defendant's Reply Memorandum of Law in Support of the Cross-Motion for Summary Judgment ("Def. Rep. Br.") (Dkt. 79).

against certain personal injury claims that might arise in the course of Cole's work at the project site. *Id.* ¶ 8.

On November 14, 2007, Linzy Dickson ("Dickson"), a Cole employee, fell approximately 18 feet from a wall while conducting demolition work at the project site. *Id.* ¶ 9–10. Dickson sustained a Grade III open tibia-fibula fracture of his right leg. *Id.* ¶ 10. He underwent immediate surgery to address his open fracture. *Id.* ¶ 11. On November 16, 2007, Dickson had a second surgery. *Id.* ¶ 12. On November 27, 2007, Dickson was discharged from the hospital. *Id.* ¶ 13.

On December 3, 2007, Dickson filed a complaint against Merkel in New York State Supreme Court. *Id.* ¶ 58. JFK was added as a defendant at the beginning of 2008. *Id.* ¶ 59. Cole eventually assumed the defense for both Merkel and JFK. *Id.* ¶¶ 61, 99. Cole held a $1 million primary insurance policy with Indian Harbor,[2] and a $10 million excess insurance policy with Scottsdale. *Id.* ¶¶ 1–6.

On August 22, 2008, Cole provided notice to Indian Harbor of Dickson's lawsuit. *Id.* ¶ 63. Indian Harbor assigned Patricia Evans ("Evans") to handle Dickson's claim. *Id.* ¶ 64. On October 15, 2008, Evans told Dean Clause ("Clause") from Scottsdale that "her initial impression [was] that [the Dickson] case [did] not pose reasonable potential for exposure beyond [the] primary policy limit." *Id.* ¶ 66. On November 12, 2008, Indian Harbor informed Cole that it had retained Gregory Katz ("Katz") and Bryan Schwartz ("Schwartz") to defend Cole against Dickson's lawsuit. *Id.* ¶ 68–69. On January 21, 2009, Evans told Clause that she had instructed Katz and Schwartz to copy Scottsdale on all reports they sent to Indian Harbor. *Id.* ¶ 71. That

---

[2] Indian Harbor is also referred to in some of the evidence as "XL Insurance." To avoid confusion, the Court has referred to defendant as Indian Harbor throughout this opinion.

same day, Evans sent an e-mail to Katz, copying Clause, in which she requested a copy of Katz's initial report on the Dickson matter.  *Id.* ¶ 72.

On January 22, 2009, Katz sent the initial report by e-mail to Evans, copying Clause.  *Id.* ¶ 73; JSF Ex. 37.  Katz summarized Dickson's injuries as "Right Grade III tibia-fibula fracture with open reduction and internal fixation; subsequent irrigation and debridement; severe disfiguring and scarring; lumbar and cervical spine injuries."  JSF ¶ 74.  As a result of these injuries, Dickson claimed $35,000 in lost earnings and $1.5 million in future lost earnings.  *Id.* ¶ 74.  Katz's assessment of the case was that liability was not reasonably in dispute.  In his words, it "appear[ed] that [Cole] caused [Dickson's] accident, and would be found liable under Labor Law § 240."  *Id.* ¶ 76; JSF Ex. 37 at 5.  The sole issue, then, was damages.  Katz's preliminary assessment of Cole's exposure was "in the $350,000–$500,000 range."  *Id.* ¶ 77.

### B.   Indian Harbor's Initial Assessment of Dickson's Claim

On March 11, 2009, after receiving the initial report from Katz, Evans presented the case to an Indian Harbor committee charged with deciding on a reserve recommendation.  *Id.* ¶ 78–81.  The committee's assessment for total exposure in Dickson's case was between $400,000 and $850,000.  *Id.* ¶ 82.  Accordingly, the committee increased Indian Harbor's indemnity reserve for the case from $10,000 to $500,000.  *Id.* ¶ 83.

On June 16, 2009, Katz provided another written report to Evans.  *Id.* ¶ 85; JSF Ex. 42.[3] Katz summarized Dickson's deposition testimony from November 21, 2008, in which Dickson stated, *inter alia*, that he:  (1) had received surgery to his right knee and ankle; (2) had undergone physical therapy to his back, neck and both shoulders twice a week for approximately six

---

[3] The Joint Stipulation states that Scottsdale was copied on the message, *see* JSF ¶ 85, but the underlying evidence appears to reflect that no one was copied, *see* JSF Ex. 42.

months; (3) was walking with a limp and with the use of a cane; (4) had residual pain in his neck and numbness in his toes; and (5) did not have injuries to his right leg, back, or neck before the accident.  JSF ¶¶ 88–90.  Based on the circumstances of the incident, Katz again concluded that Cole would be held liable for Dickson's injuries.  JSF Ex. 42.  Katz also stated that "it is expected that [Dickson] will not be able to return to work as a laborer," and that exposure would likely be "in the $600,000–$750,000+ range, based upon the surgeries and the loss of earnings claim."  JSF ¶ 94; JSF Ex. 42.

On June 17, 2009, Evans indicated in her file notes that another committee meeting was necessary to address Katz's assessment of exposure in the $600,000 to $750,000+ range.  JSF ¶ 97.  On July 28, 2009, Evans's manager, Nicolas Cordaro ("Cordaro") told Evans to proceed with committee review "as noted."  *Id.* ¶ 98; JSF Ex. 38.  On October 4, 2009, Cordaro indicated to Evans a desire to committee the case "soon."  JSF ¶ 100; JSF Ex. 38.[4]  On January 24, 2010, Cordaro again recommended scheduling the case "soon" for committee review.  JSF ¶ 101; JSF Ex. 38.  It appears that no committee review was ever scheduled.

On February 4, 2010, Katz sent Evans another written report about the Dickson case, copying Clause.  JSF ¶ 102; JSF Ex. 44.  Katz noted that they had reviewed the files of JFK's and Merkel's prior defense counsel.  JSF ¶ 103.  After summarizing the findings of various medical examinations, Katz concluded:

> Based upon the information we have (and considering that this case is venued in Kings County), this case appears to have exposure in the $750,000+ range, based upon the surgeries and the loss of earnings claim.

*Id.* ¶ 107; JSF Ex. 44 at 5.

---

[4] The Joint Stipulation states that this occurred on October 24, 2009, *see* JSF ¶ 100, but the underlying evidence indicates that it occurred on October 4, 2009, *see* JSF Ex. 38.

On March 10, 2010, Evans prepared a Large Loss Report, which requested an increase in the reserve to $750,000 in indemnity and $100,000 in expense. JSF ¶ 108. In this report, Evans further stated that "[u]pon completion of all depositions, discovery and receipt of all medical reports, it is my intent to settle the case." *Id.* ¶ 109; JSF Ex. 45. Thereafter, Evans and Cordaro set the reserve for Dickson's case at $750,000. Pl. 56.1 ¶ 14.

### C. Dickson Moves for Summary Judgment in New York State Court

On March 23, 2010, discovery closed in Dickson's case. Pl. 56.1 ¶ 16. In April 2010, Dickson moved for summary judgment on the issue of liability. JSF ¶ 112.

On April 30, 2010, Katz sent another report to Evans, copying Clause, informing Evans that Dickson had moved for summary judgment, and that Dickson's counsel, Jordan Hecht ("Hecht"), had made a settlement demand of $2 million. JSF ¶ 114; JSF Ex. 46. On May 20, 2010, after reviewing the April 30 report, Clause indicated in his file notes that "it is time to lightly push primary towards beginning negotiations." JSF ¶ 119. That same day, Clause sent an e-mail to Schwartz, copying Evans, in which he inquired about "the outlook on negotiation." *Id.* ¶ 120; JSF Ex. 48. Clause noted that it appeared that "plaintiff is telegraphing an interest in moving towards a resolution or a trial," and asked whether there was any "interest in mediation from plaintiff and [Indian Harbor]." JSF Ex. 48. On May 24, 2010, Evans responded to Clause by e-mail, stating that she planned to "conduct a few days of surveillance" and then "schedule a mediation." *Id.*

On July 6, 2010, Katz sent Evans another report, copying Clause. JSF ¶ 122; JSF Ex. 50. In this report, Katz stated that he anticipated that Dickson would "win his [summary judgment] motion" and that therefore, "the sole issue, should the case proceed to trial, would be damages." JSF ¶ 125. He also reiterated that Dickson's settlement demand was $2 million, but that

Dickson's counsel, Hecht, had indicated "he is willing to accept less." *Id.* ¶ 124; JSF Ex. 50 at 1. Finally, Katz and Schwarz recommended attempting to settle with Dickson rather than proceeding to trial. JSF ¶ 126; JSF Ex. 50 at 5.

On or about September 22, 2010, the New York State court granted Dickson's motion for summary judgment. JSF ¶ 129; JSF Ex. 52.

On September 27, 2010, Katz sent Evans another report, copying Clause, informing all parties concerned that Dickson had been granted summary judgment. JSF Ex. 52. Katz noted:

> There have been no further settlement discussions since plaintiff has made an official settlement demand of $2 million, although it appeared that plaintiff would be willing to settle for less than his demand. We would recommend attempting to mediate the case before proceeding to trial in the matter.

*Id.* at 2. Katz stated that if the case proceeded to mediation, he would "request up to $800,000 in settlement authority." *Id.* at 3; JSF ¶ 131. Katz and Schwartz reiterated this position in another report on November 16, 2010. JSF ¶¶ 134–35; JSF Ex. 55.

In sum, despite the repeated recommendations made by Indian Harbor's outside counsel to Evans to settle Dickson's case, in the nine months that elapsed between Hecht's April 2010 offer to settle for $2 million and the February 2011 mediation, Indian Harbor made no attempt to engage Hecht in settlement negotiations.

### D.   Mediation

Mediation was scheduled to take place on February 16, 2011. JSF ¶ 141. In his pre-mediation report, sent on February 11, 2011, Schwartz reiterated that Dickson's settlement demand was $2 million, and that there was "room for significant movement." JSF Ex. 59. He also stated: "[w]e think we can resolve this case for $800,000." *Id.* at 3. Evans sent an e-mail to Schwartz on February 15, 2011, stating that she was "authorized to provide you with $750,000 in settlement authority." JSF Ex. 60; JSF ¶ 145. According to deposition testimony from Evans

and Cordaro, Schwartz was told that if he wanted more settlement authority, he could ask for it during the mediation.  JSF ¶ 146.

The mediation occurred on February 16, 2011.  JSF ¶ 147.  Schwartz attended on behalf of Indian Harbor; Hecht attended on behalf of Dickson.  *Id.* ¶ 149.  No one attended the mediation on behalf of Scottsdale.  *Id.*  The mediator was Ronnie Gallina, Esq. ("Gallina").  *Id.*

The parties agree that the mediation did not result in a settlement, JSF ¶ 150, but each has a differing account of how negotiations proceeded.  It is undisputed that Hecht's initial settlement demand was $2.5 million.  Pl. 56.1 ¶ 24.   It is also undisputed that Schwartz's highest settlement offer during the mediation, on behalf of Indian Harbor, was $200,000.  *Id.* ¶ 28.  The parties dispute, however, whether Hecht's last settlement offer during the mediation was $1 million or $1.2 million.  Hecht's sworn testimony is that he told Schwartz that he was willing to accept $1 million to settle the case.  Kull Decl. Ex. 19 ("Hecht Depo.").

> Q:  Now, I think you testified that you explained to Ms. Gallina that you would take the million?
> A (Hecht):  Correct.
> Q:  Is it your testimony that you actually made that demand directly to Mr. Schwartz?
> A:  Yes.
> Q:  You recall in your head that you spoke to Mr. Schwartz and said:  We will take $1 million?
> A:  Yes.
>
> . . .
>
> Q:  The theory of the mediation was:  We'll continue to talk?
> A:  The theory was we were going to settle the case for a million dollars.  And we were going to do what we needed to do to get the case settled for $1 million.  I wasn't taking anything less than a million and I wasn't asking for anything more at that point.  I wanted the million to settle the case and move on.
> Q:  What do you mean by, "move on"?
> A:  Put that case behind me and move on to my next case.

Hecht Depo. at 22–24.  However, Schwartz's sworn testimony is that Hecht did not say he would settle the case for $1 million.  DeSanto Decl. Ex. 2 ("Schwartz Depo.") at 94–95 ("Q:  Did

[Hecht] ever say to you he will settle for $1 million at that mediation?  A:  Never").  Schwartz's

account is corroborated by the e-mail he sent to Evans immediately after the mediation, in which

he stated:

> As you know, we mediated the case today.  The plaintiff initially demanded
> $2.5m, and we offered $200,000.  The basis for the increase (from $2m) was
> because of a future life care plan of approximately $400,000 and trigger point
> injections recently received (Nov. 2010)—neither were disclosed prior to the
> mediation.
>
> I advised plaintiff that while we are interested in resolving the case, it did not
> have a value in excess of the primary policy.  After a lot of back and forth, *we left
> the mediation with a demand of $1.2m*.  No offers off the $200,000 were made,
> since they are likely seeking in excess of our authority to resolve the case so no
> sense throwing good money after bad.
>
> We are scheduled for a "report back" to [the] mediator on March 8, 2011.

Kull Decl. Ex. 22 (emphasis added).[5]

On February 18, 2011, Schwartz provided a post-mediation report to Evans, in which he

also stated that Hecht's final offer was $1.2 million.  Kull Decl. Ex. 23.  In the report, Schwartz

evaluated the additional medical records that Hecht provided him at the mediation, and requested

an increase in his settlement authority to $950,000.  *Id.*  Finally, Schwartz recommended

"resolving this case on the best possible terms up to $950,000 rather than proceed to trial," and

stated his belief that "[w]e can probably settle this case for $950,000."  *Id.* at 3.

Cordaro, Evans' supervisor, testified that he could not recall Evans ever telling him about

Schwartz's request for $950,000 in settlement authority.  Pl. 56.1 ¶ 45.  He also testified that if

---

[5] On balance, there appears to be more evidence in the record to support Schwartz's testimony
that Hecht's final demand was $1.2 million, including Schwartz's nearly contemporaneous email
to that effect.  However, assuming that Hecht's testimony at trial accords with his deposition
testimony, a reasonable jury could choose to believe Hecht that his final demand was $1 million.
Hecht is not a party to this lawsuit, and would appear to have little incentive to provide
deliberately false testimony on this point.

he had been informed about the request for $950,000 in settlement authority, he would have discussed the situation with Evans, Schwarz, and his own manager, Michael Archie. *Id.* ¶ 47. In any case, Evans did not secure additional settlement authority for Dickson's case until October 2011—nearly eight months after Schwartz made his request. *Id.* ¶ 46.

### E.      Events Between the Mediation and Dickson's Back Surgery

During the critical period between the mediation in February 2011 and Dickson's back surgery in June 2011, Indian Harbor never increased its $200,000 settlement offer to Hecht, despite its own attorneys' recommendation to settle the case for up to $950,000.

Hecht, however, did make efforts to move the case toward settlement. On February 23, 2011, Hecht sent a settlement demand letter to Evans via Federal Express Overnight Mail. Pl. 56.1 ¶ 54; Kull Decl. Ex. 28 ("Feb. 23 Settlement Demand Letter"). In this letter, Hecht stated that Dickson sustained, in addition to the open-fracture to his leg, "a significant injury to his lumbar spine including a broad based disc protrusion at L5-S1." *Id.* at 2. According to Hecht, Dickson was scheduled to receive "a series of lumbar epidural steroid injections," and if those failed to alleviate Dickson's back complaints, Dickson would "require lumbar fusion surgery." *Id.* Hecht's letter closed with a demand for "full tender of the $1,000,000.00 policy limits" so that "we may thereafter proceed against the excess coverage." *Id.*

According to Hecht, his intent, in sending the Feb. 23 Settlement Demand Letter, was to communicate his willingness to settle the entire case for $1 million, and that, despite the language in the last paragraph, he had "no intention" of going after the excess coverage. Hecht Depo. at 43–44. Contradicting Hecht's testimony, however, is the plain language of the February 23rd letter, which states an intent to proceed against the excess coverage.

In any case, Evans, to whom the Feb. 23 Settlement Demand Letter was addressed, has testified that she never received the letter.  Pl. 56.1 ¶ 64; Kull Decl. Ex. 10 ("Evans Depo.") at 198, 200.  A mailroom receipt, however, confirms that Indian Harbor as an entity received the letter on February 24, 2011 at 10:59 a.m.  Pl. 56.1 ¶ 65.  Cordaro testified that, typically, any mail addressed to Evans that was received in the mailroom would be delivered to Evans' individual mailbox.  Kull Decl. Ex. 15 ("Cordaro Depo.") at 22.  Neither Evans, nor anyone else at Indian Harbor, can explain why Evans would not have received the letter.

On March 1, 2011 and March 7, 2011, Schwartz and Hecht had settlement discussions over the phone.  Pl. 56.1 ¶ 67.  As detailed above, Schwartz still had only $750,000 in settlement authority from Evans.  According to Hecht, during these discussions, Schwartz conveyed to him, "I don't have the million, or something to that effect."  Hecht Depo. at 57.  Neither conversation resulted in a settlement.  Pl. 56.1 ¶ 68.

On March 7, 2011, Hecht sent another settlement demand letter to Indian Harbor, this time copying Clause from Scottsdale.  *Id.* ¶ 76; Kull Decl. Ex. 32 ("March 7 Settlement Demand Letter").  In this letter, Hecht states:

> On February 23, 2011, a letter was sent to your attention, demanding payment of the full policy limits of $1,000,000.00 to settle this matter.  This letter was sent as a follow up to the mediation held on February 16, 2011.  I was just advised that [Indian Harbor] has refused to tender the policy.  Be advised that our offer to resolve this matter will remain open until 4PM on March 8, 2011.  If the policy is not tendered by that date the offer to settle will be revoked and plaintiff will no longer accept same.

March 7 Settlement Demand Letter.  As Hecht testified, this letter was more "unequivocal" in stating "[p]ay me the million, . . . and the case is settled."  Hecht Depo. at 44.  According to Hecht, the March 7th letter showed that he was "more than willing to take the million dollars March 8th—until the back really developed, we were more than willing to take the million."  *Id.*

at 71.  Evans testified that she never received this letter, either.  Pl. 56.1 ¶ 77; Evans Depo. at

198.  A mailroom receipt, however, confirms that Indian Harbor received the letter on March 8,

2011 at 11:38 a.m.  Pl. 56.1 ¶ 78.  Again, no one can explain why Evans would not have received

the letter from Hecht.

On March 24, 2011, Clause sent Schwartz an e-mail about Hecht's March 7 Settlement

Demand Letter, which stated:

> I recently received a copy of a letter from [Hecht] indicating that he had made a
> time limited demand of $1 million (expiring on 3/8/11).  I'd appreciate if you
> could bring me up to speed on current negotiations.  I recall that you had
> requested settlement authority of $950,000 but hadn't heard anything further.  Is
> this resolved and if so, what was the settlement amount.

Kull Decl. Ex. 33.  On March 28, 2011, Schwartz responded to Clause's message, copying

Evans, and stated, "[t]he case has not resolved.  I am in the process of preparing a full report

since the mediation which you will have this week."  Kull Decl. Ex. 34.  Schwartz did not,

however, send a full report as promised.  On April 6, 2011, Evans sent an e-mail responding to

both Schwartz and Clause, stating "Ok and then I will committee the case if more authority is

needed."  *Id.*  Again, Evans did not, as she promised, committee the case to obtain additional

settlement authority.

Although Indian Harbor's theory of the case appears to be that neither Evans nor

Schwartz received Hecht's March 7 Settlement Demand Letter, *see* Def. 56.1 ¶¶ 36–39, the

Court notes that neither Schwartz nor Evans, in their e-mail responses to Clause, disputed, or

even inquired about, Clause's statement that Hecht made "a time limited demand of $1 million

(expiring on 3/8/11)."  Kull Decl. Ex. 33.  Although it is possible that Evans and Schwartz read

Clause's e-mail quickly and did not appreciate what he was asking, a reasonable jury could

readily find that this e-mail thread, coupled with the mailroom receipt detailed above, makes

Evans's claim that she did not receive Hecht's March 7 Settlement Demand Letter implausible. Such credibility assessments, however, are for a jury, not the Court.

On April 28, 2011, Schwartz and Hecht spoke about settlement again by phone.  Pl. 56.1 ¶ 89.  No settlement was reached.  According to Schwartz, nothing had changed, as Hecht was still in the "million plus area."  Schwartz Depo. 131–132.  Again, Schwartz never increased his offer above $200,000, even though his own assessment was that the case should be settled for $950,000.  At this point, Schwartz still had the authority to offer only $750,000, inasmuch as Evans had not requested additional settlement authority.

On May 6, 2011, Dickson's physician, Dr. Andrew Merola, recommended that Dickson have back surgery.  JSF ¶ 156.  On June 2, 2011, Dickson underwent spinal fusion back surgery. JSF ¶ 157; Kull Decl. Ex. 39.  On June 10, 2011, Hecht served a Supplemental Bill of Particulars, informing Schwartz of Dickson's surgery.  JSF ¶ 158.

In the four-and-a-half months between April 6, 2011 and August 18, 2011, there is no evidence that Evans, or anyone else from Indian Harbor, communicated with their lawyers (Katz and Schwartz) or Scottsdale (Clause) concerning Dickson's lawsuit.  Pl. 56.1 ¶ 92.

### F.    Settlement Negotiations After Dickson's Back Surgery

On August 4, 2011, Schwartz provided a report to Evans, copying Clause.  Kull Decl. Ex. 40.  In the report, Schwartz stated that Hecht had withdrawn his demand for settlement after Dickson's back surgery and refused to provide a new one.  *Id.* at 4.  Schwartz stated that we "continue to recommend resolving this case on the best possible terms up to $950,000 rather than proceed to trial. . . . [But] with plaintiff's most recent surgery, we anticipate that plaintiff's demand will increase."  *Id.*

This prediction proved accurate.  On August 29, 2011, Hecht sent a new settlement demand letter to Evans, copying Schwartz and Clause, demanding $4 million to settle the case. Pl. 56.1 ¶ 98; Kull Decl. Ex. 41.  Hecht stated that he was "open to discussing a pre-trial resolution of this matter, but will not enter into any negotiations whatsoever until the primary layer of insurance has been tendered."  Kull Decl. Ex. 41 at 2.  Evans could not recall if she received this letter, and a copy of the letter was not found in Indian Harbor's claim file.  Pl. 56.1 ¶ 99.  But again, a mailroom receipt confirms that Indian Harbor received the demand letter on August 30, 2011.  *Id.*  Evans, in summary, claims that she either did not receive, or did not see, any of the three settlement demand letters that Hecht sent and Indian Harbor received in its mailroom.

Trial in Dickson's case was set for November 9, 2011.  Kull Decl. Ex. 42.  In October 2011, Schwartz sent Evans a pre-trial report, but did not copy Scottsdale. Pl. 56.1 ¶ 101.  This report provided the following assessment of Dickson's case:  (1) full liability value of $2.5 to $3 million; (2) case evaluation of $2.5 to $3 million; (3) defense counsel evaluation of $2 million; (4) verdict range of $3+ million; and (5) "amount we should pay before letting the Jury decide the issue" of $2 million.  Kull Decl. Ex. 43.  The report also summarized past negotiations, stating that Indian Harbor had offered $200,000 on March 2, 2011, that Hecht had demanded $4 million on October 20, 2011, and that the "present authorization" from Indian Harbor remained at $750,000.  *Id.*  The report requested an authorization of $1.8 million.  *Id.*

On October 13, 2011, Clause sent an e-mail to Evans, asking about the plan for settling the case, and, for the first time, criticizing Indian Harbor's failure to settle before Dickson's back surgery.  Kull Decl. Ex. 44.  The e-mail reads, in relevant part:

> Please advise what your plan is for this.  The trial is in 4 weeks and plaintiff has presented a demand of $4 million . . . in which he indicated he would not

negotiate unless your full policy limit is available.  Defense counsel's evaluation has gone from $800k to $950k to the current estimated value of $1.5-$1.8 million. . . . In early 2011 plaintiff provided a time limited settlement demand of $1 million, you declined to offer more than the $200k that was extended during the February 2011 mediation.  Since that mediation and the subsequent time limited settlement demand, this case has degraded significantly to the point where plaintiff's demand has quadrupled and the opportunity to resolve this claim within [Indian Harbor's] policy limit ceased to exist.

If your policy limit is available in the negotiation on this case that fact should be communicated immediately to Scottsdale so that we may engage in appropriate settlement discussions with plaintiff counsel.

*Id.*  Evans could not recall what, if anything, she did in response to Clause's e-mail.  Pl. 56.1 ¶ 107.

Also on October 13, 2011, Clause sent an e-mail to Katz, one of Indian Harbor's lawyers. Pl. 56.1 ¶ 108.  In this message, Clause notes, accurately, that only recently had Katz's assessment of Dickson's claim been "in excess of the primary policy limit."  Kull Decl. Ex. 45. Clause stated that he sought Katz's "evaluation of the validity of plaintiff's damages claim," and asked what "exactly was the last offer presented to plaintiff counsel and when."  *Id.*  On October 14, 2011, Clause spoke with Schwartz by phone.  Pl. 56.1 ¶ 109; Kull Decl. Ex. 46.  According to Clause's notes from the call, Schwartz confirmed that the only offer presented to Hecht was $200,000 at the mediation, and that Schwartz now believed it would take $2.1 million to settle the case.  Kull Decl. Ex. 46.

On October 20, 2011, Evans sent an e-mail to Katz, asking whether trial was still scheduled for November 9, 2011 and whether there was a mediation scheduled for before trial. Kull Decl. Ex. 47.  Katz responded that he would call Evans when he got back from court to verify if the trial would be adjourned.  *Id.*  In response, Evans wrote, at 9:37 a.m.:

I hope it is adjourned.  *This file totally slipped off my radar.*  I do have $750,000 in settlement authority but have to prepare a report to get the additional $250,000 you are requesting.

15

*Id.* (emphasis added).  In response, Katz wrote that both Hecht and Clause wanted to mediate the case, and confirmed that trial "could start" on November 9, 2011.  *Id.*

On October 20, 2011, at 10:32 a.m., Evans sent an e-mail to Clause, telling him that Hecht had refused to participate in a mediation until Indian Harbor tendered its $1 million primary policy.  Kull Decl. Ex. 48.  Evans stated that she did not anticipate any trouble getting that authority.  *Id.*  At 3:37 p.m. that same day, Clause responded to Evans, stating that once Indian Harbor tendered its policy, Scottsdale would "assume control and responsibility for the defense expenses on outstanding claims."  *Id.*  Clause also confirmed that he would mediate the case with Hecht on October 31, 2011.  *Id.*  The next day, October 21, 2011, Evans forwarded Clause's e-mail to Katz, stating "FYI!  E-mail I got from the excess carrier yesterday."  *Id.*  Katz responded, "All good—[Indian Harbor] will be off the hook."  *Id.*  Thereafter, Indian Harbor tendered its policy and Scottsdale took over settlement negotiations.

On November 4, 2011, before the scheduled trial date of November 9, 2011, Dickson agreed to a settlement of $2.5 million.  JSF ¶ 162.  Of this amount, Indian Harbor paid $1 million and Scottsdale paid $1.5 million.  *Id*.

### G.    Procedural History of Scottsdale's Claim Against Indian Harbor

On April 5, 2012, Scottsdale filed the Complaint in this case, alleging that Indian Harbor had the opportunity to settle the Dickson action within the primary policy limit of $1 million, and that its failure to do so constituted bad faith under New York law.  Dkt. 1 ("Compl.").  Scottsdale sought to recover $1.5 million, plus interest.  On July 15, 2013, after the completion of discovery, Scottsdale moved for summary judgment.  Dkt. 58.  On August 5, 2013, Indian Harbor opposed Scottsdale's motion and cross-moved for summary judgment.  Dkt. 69.  On August 19, 2013, Scottsdale filed a reply brief in support of its motion and an opposition to

Indian Harbor's cross-motion.  Dkt. 77.  On September 4, 2013, Indian Harbor filed a reply brief in support of its motion.  Dkt. 79.  On September 12, 2013, the Court heard argument.

## II.      Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

**III.    Discussion**

**A.    The Duty of Good Faith**

In New York, insurers owe a duty to those they insure "to act in 'good faith' when deciding whether to settle" a claim. *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). A primary insurer also owes this duty of good faith to an excess insurer. *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 241 (2d Cir. 2002) (citing *Pavia v. State Farm Mut. Auto. Ins. Co*., 82 N.Y.2d 445, 452 (1993)).   Here, Scottsdale, the excess insurer, claims that Indian Harbor, the primary insurer, violated its duty of good faith by failing to settle Dickson's case for an amount at or within the limits of the primary insurance policy.  Under New York law, a primary insurer such as Indian Harbor, "may be held liable for breach of that duty." *Pinto*, 221 F.3d at 388.

"The duty of good faith reflects the inherent conflict between the primary insurer's desire to settle the claim for as little as possible and the excess insurer's desire to avoid a judgment exceeding the primary policy limit."  *New England Ins. Co.*, 295 F.3d at 241 (citing *Smith v. Gen. Acc. Ins. Co.*, 91 N.Y.2d 648, 653 (1998)).  As the New York Court of Appeals has explained:

> Naturally, whenever an insurer is presented with a settlement offer within [primary] policy limits a conflict arises between, on the one hand, the insurer's interest in minimizing its payments and on the other hand, the insured's [or excess insurer's] interest in avoiding liability beyond the [primary] policy limits.  By refusing to settle within the [primary] policy limits, an insurer risks being charged with bad faith on the premise that it has advanced its own interests by compromising those of its insured, or even those of an excess insurance carrier who "alone [may be] placed at further risk due to the defendant's intractable opposition to any settlement of the claim."

*Pavia*, 82 N.Y.2d at 452 (quoting *St. Paul Fire & Marine Ins. Co. v. U.S. Fid. & Guar. Co.*, 43 N.Y.2d 977, 978 (1978)) (other citations omitted).  "A primary insurer discharges its duty of

good faith by giving as much consideration to the excess carrier's interests as it does to its own." *New England Ins. Co.*, 295 F.3d at 241 (citation omitted).

To succeed, an excess insurer who brings a claim of bad faith against a primary insurer must establish two things:  that (1) the primary insurer exhibited "gross disregard" for the interests of the excess insurer under New York's multi-factor test; and (2) this gross disregard *caused* the loss of an actual opportunity to settle the case within the primary policy limit.  *See New England Ins. Co.*, 295 F.3d at 242 (approving jury instructions in which the district court instructed jurors to determine "gross disregard" using a multi-factor test and "to assess 'causation' by determining whether . . . [defendant] acted in bad faith at a time or times when it had an actual opportunity to settle the [underlying] action for an amount within the primary policy limit").

The first prong in the bad faith inquiry turns on whether the primary insurer acted "in gross disregard of the excess carrier's interests." *Id.* at 241 (citation omitted).  Gross disregard is defined as "a pattern of behavior evincing a conscious or knowing indifference to the probability that an [excess insurer] would be held . . . accountable for a large judgment if a settlement offer within the policy limits were not accepted."  *Pavia*, 82 N.Y.2d at 453–54.  This standard "strikes a fair balance between two extremes by requiring more than ordinary negligence and less than a showing of dishonest motives."  *Id.* at 454.  Under New York law, the factfinder assesses gross disregard using a multi-factor test.  *See New England Ins. Co.*, 295 F.3d at 242 ("New York State court decisions, as well as decisions of this Court, consistently have employed a multifactor test."); *Pinto*, 221 F.3d at 399 ("No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith.").  Relevant factors include:

(1) plaintiff's likelihood of success on the liability issue in the underlying action;

19

(2) the potential magnitude of damages and the financial burden each party may be exposed to as a result of a refusal to settle;

(3) whether the primary insurer properly investigated the claim and any potential defenses;

(4) the information available to the primary insurer when the demand for settlement was made;

(5) any other evidence which tends to establish or negate the primary insurer's bad faith in refusing to settle.

*Pavia*, 82 N.Y.2d at 454–55; *see also* N.Y. Pattern Jury Instr. 4:67 ("Excess Liability for Bad Faith Settlement or Failure to Settle").  In weighing these factors, the touchstone inquiry is whether there was a high probability that the excess insurer "would be subject to personal liability because of the [primary] insurer's actions, and whether an excess verdict reasonably could have been predicted."  *Pinto*, 221 F.3d at 399.

The second prong in the bad faith inquiry turns on whether the primary insurer's gross disregard, once established, caused the loss of an opportunity to settle the case for an amount within the policy limits.  Put another way, the plaintiff in a bad faith claim must establish that "a causal connection exists between the insurer's bad faith . . . and the loss of an actual settlement opportunity."  *New England Ins. Co.*, 295 F.3d at 241; *see also Employers Mut. Cas. Co. v. Key Pharm.*, 75 F.3d 815, 823 (2d Cir. 1996) (a primary "insurer under New York law is liable for the amount of a settlement in excess of its coverage only if the . . . excess insurer can show that the bad faith prejudiced an actual opportunity to settle within the coverage limits of the [primary] insurer in control of the claim"); *Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 204 (E.D.N.Y. 2011) (because plaintiff has "not come forward with any evidence that [the plaintiff in the underlying action] offered to settle his claims for an amount less than [primary] policy limit of $100,000, [plaintiff's] bad faith claim against [defendant] must be dismissed" on summary

judgment); *Pavia*, 82 N.Y.2d at 454 ("[T]he plaintiff in a bad-faith action must show that the insured lost an actual opportunity to settle the claim at a time when all serious doubts about the insured's liability were removed.") (citation omitted).

### B.  Scottsdale's Motion for Summary Judgment

For Scottsdale to prevail on its motion for summary judgment, the evidence, viewed in the light most favorable to Indian Harbor, must establish that:  (1) under New York's multi-factor test, Indian Harbor exhibited gross disregard for Scottsdale's interests in its handling of Dickson's case; *and* (2) this gross disregard caused Indian Harbor to lose an actual opportunity to settle Dickson's case for an amount within the primary policy limit—*i.e.*, $1 million.

### 1.  Gross Disregard

On the first prong, there is substantial evidence to support Scottsdale's claim that Indian Harbor's handling of Dickson's case met the standard for gross disregard and bad faith.

The first consideration under New York's multi-factor test is the likelihood of Dickson's success on liability.  Indian Harbor concedes, as it must, that as early as January 22, 2009, its counsel predicted that Cole would be held liable for Dickson's accident.  JSF ¶ 76; JSF Ex. 37 at 5.  This fact became indisputable after September 22, 2010, when the New York State court granted Dickson's motion for summary judgment.  JSF Ex. 52.  All of the relevant settlement negotiations occurred after Dickson prevailed on summary judgment and liability was assured.  Thus, this first factor heavily favors Scottsdale.

The second factor—the potential magnitude of damages—also favors Scottsdale.  The parties agree that it was Dickson's spinal fusion back surgery on June 2, 2011 that caused Dickson's damages to rise dramatically.  Although Indian Harbor disclaims any knowledge that Dickson was going to require back surgery, there is evidence in the record that Indian Harbor

knew, at the least, about Dickson's back *injury* as early as its first report on January 22, 2009, *see* JSF Ex. 37, and that the *possibility* of Dickson's back surgery was also known to Indian Harbor after the mediation took place on February 16, 2011.  At that mediation, Hecht provided Schwartz with medical records relating to Dickson's back injuries and to the treatments Dickson was receiving for those injuries.  Pl. 56.1 ¶¶ 25–26.  Further, on February 18, 2011, Schwartz sent a report to Evans, in which he stated:

> [Dickson] is still walking with a cane, and has not yet returned to work. Moreover, while his right leg has essentially healed (despite walking with a cane), *he is still treating for his back*.  He recently underwent a series of trigger point injections to his lumbar on November 15, 2010, November 19, 2010 and November 23, 2010, which have not helped relieve the pain.  He returned to Dr. Totero, the doctor appointed by worker's compensation for an IME, who stated in his November 2010 report that plaintiff should continue with physical therapy, but that if it doesn't help, the plaintiff should undergo an additional round of injections and recommended epidurals.  The plaintiff has received authority from worker's compensation to have the epidurals.  Plaintiff's treating physician has said that if the epidurals do not help relieve the pain, *that spine surgery should be explored*.  The workers compensation doctor stated that "plaintiff is not a surgical candidate at this time."

Kull Decl. Ex. 23 at 2 (emphases added).  Of course, that Dickson would need back surgery was by no means certain; according to Schwartz, Dickson was not a candidate for back surgery *at that time*.  But beginning at least on February 16, 2011, Indian Harbor was on notice that the prospect of Dickson requiring back surgery was something to take into account when deciding whether to settle Dickson's case.  Considering the fact that, by all accounts, Dickson's back surgery dramatically increased the potential settlement value of Dickson's case, it would have been reckless for Indian Harbor to ignore the possibility that failing to settle the case promptly could, were Dickson to require surgery, expose Scottsdale to significant liability.

The next relevant factor is whether there is "any other evidence" which tends to establish or negate the primary insurer's bad faith in refusing to settle.  A synthesis of the case chronology

is the most useful way to approach this factor.  Indian Harbor's own actions—or more pointedly, its inactions—supply substantial evidence on which a jury could find that it approached the settlement of Dickson's case with gross disregard for Scottsdale's interests.

In April 2010, Hecht offered to settle the case for $2 million.  JSF ¶ 114; JSF Ex. 46.  At that time, liability was not reasonably in dispute, and Indian Harbor's attorneys had already assessed Cole's potential exposure to be in the $750,000+ range.  JSF ¶ 107; JSF Ex. 44.  From April 2010 on, Indian Harbor's attorneys repeatedly recommended settlement discussions, and expressed their belief that Hecht would accept far less than his $2 million demand to settle the case.  Nonetheless, Indian Harbor made no effort to engage in settlement negotiations with Hecht during the nearly 10 months that elapsed between April 2010 and February 2011.

The period after February 2011 also supplies evidence on which a reasonable jury could find gross disregard by Indian Harbor of Scottsdale's interests.  For three-and-a-half months— from the mediation on February 16, 2011 until Dickson had back surgery on June 2, 2011— Indian Harbor never offered Hecht more than $200,000.  This was true even after February 18, 2011, when Indian Harbor's own outside counsel expressed that the case should be settled for $950,000.  *See* Kull Decl. Ex. 23.  At that point, depending on the evidence the jury ultimately chooses to credit, Hecht had told Schwartz that he was willing to settle the case for either $1 million or $1.2 million, while Indian Harbor's attorneys recommended settling for $950,000. Hecht and Indian Harbor were thus either $50,000 or $250,000 apart on what it would take to settle the case.  Yet Indian Harbor let the case languish for four-and-a-half months, never offering Hecht more than $200,000.  Under the circumstances, a reasonable jury could regard the $200,000 offer as a non-starter.  Such a jury could therefore view this evidence as signifying that Indian Harbor deliberately placed greater importance on its own $50,000—*i.e.*, the difference

23

between the $950,000 at which its outside counsel recommended settling and Indian Harbor's $1 million primary policy limit—than on the risk that a jury would ultimately return a verdict that could expose Scottsdale to substantial liability (considering that Scottsdale's excess policy was for $10 million). Given that Indian Harbor knew, as of February 18, 2011, that Dickson might possibly require back surgery, this risk, such a jury could find, was not insignificant. Because a primary insurer is required to "giv[e] as much consideration to the excess carrier's interests as it does to its own," *New England Ins. Co.*, 295 F.3d at 241, such a calculation by Indian Harbor could be held to breach the good faith obligation it owed to Scottsdale. *See also Pavia*, 82 N.Y.2d at 453–54 (defining gross disregard as "a pattern of behavior evincing a conscious or knowing indifference to the probability that an [excess insurer] would be held . . . accountable for a large judgment if a settlement offer within the policy limits were not accepted").

Further, importantly, under New York law, Scottsdale is not required to show that Indian Harbor was so calculating in its disregard of Scottsdale's interests. *See Pavia*, 82 N.Y.2d at 453 (bad faith does not require a "sinister motive on the part of the insurer"). A jury alternatively could find that Indian Harbor was reckless in how it handled the Dickson matter. *See Pinto*, 221 F.3d at 400 ("*Pavia* makes clear that the gross disregard standard may be satisfied by a finding of recklessness on the part of the insurer."). As detailed above, on February 18, 2011, Indian Harbor's attorneys requested an increase in its settlement authority from $750,000 to $950,000. Evans did nothing with this request for nearly eight months. This left Indian Harbor's attorneys in a position where they could not offer Hecht more than $750,000 to settle the case, an amount Hecht was unlikely to accept. Had Evans provided settlement authority of $950,000—as she promised to in April 2011—it is not unreasonable to believe that Hecht would have, as he

testifies, accepted that amount, or close to it, in order to settle the case before Dickson's back surgery.

In this regard, Evans' denials that she ever received the settlement letters sent by Hecht on February 23, 2011 and March 7, 2011, and received by Indian Harbor, are, potentially, quite probative. A jury could reasonably regard Evans' testimony to this effect as implausible and, indeed, knowingly false. Such a jury could reasonably conclude that such false testimony was given by Evans to cover up her failure to respond, or to settle the case at a time when a settlement within the primary policy limit was attainable.

Regardless, it is undisputed that Evans received Clause's e-mail on March 24, 2011, which expressly references Hecht's March 7, 2011 settlement demand letter. Kull Decl. Ex. 33. Yet Evans did not ask Clause what he meant by this reference to Hecht's settlement demand, nor did she take any steps to respond to the concerns Clause raised in his e-mail. All Evans did was tell Clause and Schwartz that she would committee the case to obtain more settlement authority. *Id.* Ex. 34. However, as detailed above, Evans did not carry out this commitment. In fact, there is no indication that Evans took any action on Dickson's case in the over four months between April 6, 2011, when she sent her one-sentence e-mail promising to increase Schwartz's settlement authority, and August 4, 2011, when Schwartz informed her that Dickson had back surgery. Even after August 4, 2011, upon learning that Dickson had back surgery, Evans still did nothing. Hecht sent a $4 million settlement demand on August 29, 2011, which Evans claims not to recall receiving. *Id.* Ex. 41. Evans only resurfaced, belatedly, on October 20, 2011, when she sent Katz an e-mail asking whether trial was still scheduled for November 9, 2011. *Id.* Ex. 47. In light of this chronology, a jury could find Evans' statement to Katz about Dickson's

upcoming trial to be a telling admission of her overall level of disregard:  "I hope it is adjourned. This file totally slipped off my radar."  *Id.*

On the issue of whether Indian Harbor disregarded the interests of its excess carrier, a jury could also find telling Indian Harbor's apparent failure, at any point before Dickson's back surgery, ever to offer more than $200,000 in settlement discussions.  Under New York law, a primary insurer's unrealistic settlement posture that exposes an excess carrier to risk is potentially significant evidence of bad faith.  *See State v. Merchants Ins. Co. of New Hampshire*, 486 N.Y.S.2d 412 (3rd Dep't 1985).  In this respect, Indian Harbor's settlement posture bears some similarity to that of the primary insurer in *Merchants Ins. Co.*, in which the Third Department affirmed a jury verdict against an insurer for bad faith failure to settle.  *Id.*  There, the State of New York was sued for wrongful death by the estate of a driver killed in an accident with a State-owned dump truck.  The State's insurance company took the lead on defending the suit.  The decedent's estate in the underlying action demanded a settlement of $90,000.  The insurance company offered only $45,000 and refused to increase its offer.  Ultimately, the plaintiff was awarded $150,000—an amount greater than the State's $100,000 policy limit.  The State then sued the insurance company for handling settlement negotiations in bad faith.  The jury found for the State.  On appeal, the Third Department concluded that:

> The record before us supports the view that defendant was well aware that its proposed $45,000 settlement figure was substantially lower than the liability it could reasonably expect to incur. The jury could reasonably have reached the conclusion that defendant exercised bad faith in failing to protect the interest of its insured by coming forth with a reasonable and fair settlement offer, as it was contractually and statutorily required to do.

*Id.* at 413 (citations omitted).  The court rejected defendant's "principal argument" that it "never had an opportunity to settle within the policy limits," stating that because "no realistic offer was made in response to the demand of $90,000, nor was the possibility of settlement for $75,000

26

explored," the lack of opportunity to settle "was the direct result of defendant's own conduct." *Id.* at 413–14.  "Defendant never indicated that it would make a fair and reasonable offer and, by failing to do so, defendant suppressed negotiations."  *Id*. at 414; *see also Reifenstein v. Allstate Ins. Co.*, 461 N.Y.S.2d 104, 106 (1983) ("In this case the element of bad faith may be inferred from, *inter alia,* the certainty of liability arising out of the one-car accident and the obviousness that the damages would exceed $10,000; the initial refusal to settle for $10,000, an amount only $500 more than Allstate was willing to pay; the explanation given by Allstate to decedent's family for its refusal to settle; and, the delay in making the unconditional offer of $10,000.").[6]

Here, a jury could find, Indian Harbor's offer of $200,000 was a low-ball offer far below the likely outcome had Dickson's case resulted in a jury verdict.  The jury could also find that Indian Harbor never made Hecht a plausible offer, even after Hecht reduced his demand from $2.5 million to $1.0 or $1.2 million, and that Indian Harbor's failure to make a plausible offer in the face of palpable risk to the excess carrier evinced bad faith.

In sum, a jury could easily find the first element, gross disregard of the excess carrier's interests, in favor of Scottsdale.  A reasonable jury could find that the handling of Dickson's case by Indian Harbor's agent, Evans, was incompetent and reckless, and that Indian Harbor's failure to even attempt settlement negotiations evinced gross disregard for the possibility that Scottsdale would be exposed to substantial liability.  *See Pavia*, 82 N.Y.2d at 453–54 (noting possibility of liability on part of primary carrier where "a pattern of behavior" reflected indifference to the

---

[6] Indian Harbor urges the Court to disregard both *Merchants Ins. Co.* and *Reifenstein* because they were both decided before *Pavia*.  *See* Def. Rep. Br. 13.  However, both cases remain good law, and the Court does not read either as inconsistent with the legal standard set forth in *Pavia* or in any later New York State court decision.

prospect that the excess carrier would be held "accountable for a large judgment if a settlement offer within the policy limits were not accepted").

The Court, however, has no occasion at this stage to determine whether a reasonable jury could find otherwise on this element, *i.e.,* in favor of Indian Harbor.  That is because, for the reasons that follow, the Court denies Scottsdale's motion for summary judgment on a different ground, specifically, that there exist material disputed issues of fact with respect to the element of causation.  It will be for the jury at trial to make the determination on the element of gross disregard.

### 2.     Causation

Even assuming that Indian Harbor's actions were held to constitute gross disregard of the interests of its excess carrier, to prevail, Scottsdale would still be required to prove that Indian Harbor's bad faith caused it to lose the opportunity to settle Dickson's case for an amount within the primary policy's limits.  As to this point, the Court holds, there is a disputed issue of material fact, specifically, as to whether Indian Harbor had the opportunity to settle Dickson's case for $1 million or less.  *See Anderson*, 477 U.S. at 248 (material fact is one that "might affect the outcome of the suit under the governing law").

As Scottsdale notes, there is substantial evidence to support its claim that Indian Harbor's bad faith caused the loss of a concrete opportunity to settle Dickson's case for an amount within the primary policy limit.  Hecht's sworn testimony is that he was willing to accept $1 million to settle the case during the mediation, and, indeed, up to the point where Dickson's back condition deteriorated.  Hecht Depo. at 22–24.  But this testimony is controverted.  According to Schwartz, Hecht never told him, during the mediation, he would settle the case for $1 million.  Schwartz Depo. at 94–95.  Schwartz's account is corroborated by the e-mail he sent to Evans immediately

after the mediation, as well as his report on February 18, 2011, in which he stated that Hecht's final offer was a settlement demand for $1.2 million. Kull Decl. Exs. 22, 23. Indian Harbor has adduced enough evidence to put meaningfully at issue Scottsdale's claim that Hecht's final offer at mediation was $1 million.

To be sure, even if the jury were to find, with Indian Harbor, that Hecht's final offer at the mediation was $1.2 million, this would not end the causation inquiry. As Scottsdale notes, Hecht also sent settlement demand letters to Evans on February 23, 2011 and March 7, 2011. If these two letters were unambiguous offers to settle Dickson's case in its entirety for $1 million, a Court could find that the causation element was established, at least as of those dates. But neither letter is sufficiently clearcut to permit such a determination by the Court. As to the letter sent on February 23, 2011, there is a substantial disagreement over its meaning. The plain language of the letter supports Indian Harbor's argument that Hecht was demanding *more* than $1 million to settle the case, and indeed that it did not intend to discharge its claims as against Scottsdale. *See* Feb. 23 Settlement Demand Letter (demanding "full tender of the $1,000,000.00 policy limits" so that "we may thereafter proceed against the excess coverage"). On the other hand, Hecht's testimony supports Scottsdale's argument that the letter should be read as communicating a willingness to settle the entire case for $1 million. *See* Hecht Depo. at 43–44 (testifying that, despite the language in the last paragraph, he had "no intention" of going after the excess coverage). It is for the jury to decide whether, as of February 23, there was an opportunity for Indian Harbor to settle Dickson's case, in toto, for $1 million.

On its face, the March 7, 2011 letter is closer to an unambiguous settlement demand for $1 million in exchange for terminating the lawsuit. *See* March 7 Settlement Demand Letter ("On February 23, 2011, a letter was sent to your attention, demanding payment of the full policy

limits of $1,000,000.00 to settle this matter."). But context is critical. This letter references the February 23, 2011 letter. Thus, a different interpretation of the letter is available: that the letter incorporated a demand from that earlier letter—which, as noted, is plausibly read as a request for Indian Harbor to tender its policy so that Hecht could thereafter pursue Scottsdale, the excess insurer. Further, the March 7, 2011 letter imposed a tight time limit on acceptance: The offer was open only until 4 p.m. on March 8, 2011. *Id.* The mailroom receipt shows that Indian Harbor received the letter on March 8, 2011 at 11:38 a.m. Pl. 56.1 ¶ 78. Therefore, Indian Harbor could plausibly argue that it had little more than four hours to respond to Hecht's settlement demand. And the Court of Appeals in *Pavia* has instructed that "the injured plaintiff's chosen timetable for settlement" should not be permitted "to govern the bad-faith inquiry." 82 N.Y.2d at 455; *see also id.* (reversing a jury finding of bad faith where plaintiffs' allegations "stem[med] principally from defendant State Farm's failure to abide by a settlement deadline unilaterally established by plaintiff Pavia's counsel"); *Lavaud v. Country-Wide Ins. Co.*, 798 N.Y.S.2d 710 (Sup. Ct. 2004) *aff'd*, 815 N.Y.S.2d 680 (2006) ("Thus, plaintiff's entire case rests upon a settlement demand that was only open for ten days and was made a mere two days after she commenced the underlying action. In *Pavia,* the Court of Appeals expressed strong disapproval of such time-limited settlement offers on public policy grounds."). Under these circumstances, New York law precludes a grant of summary judgment based solely upon Indian Harbor's failure to respond to a settlement deadline unilaterally established by Hecht— particularly when that deadline gave Indian Harbor mere hours to respond.

That said, even if Hecht never made an explicit, documented $1 million offer to settle the case, either at the mediation or in either settlement letter, the factfinder could still conclude, based on the totality of the evidence, that Indian Harbor had the *opportunity* to settle the case for

$1 million, and that its gross disregard for Scottsdale's interest in the handling of settlement negotiations caused the loss of that opportunity.  As the Second Circuit has explained, the plaintiffs' expressed "willingness to settle for the policy limits is one way, *but not the only way*, to show that an actual opportunity to settle existed."  *New England Ins. Co.*, 295 F.3d at 247 (citing *Pinto*, 221 F.3d at 401) (emphasis added).  Put differently, a factfinder could be convinced by the overall circumstances that Indian Harbor had an opportunity to settle Dickson's case for $1 million—even if Hecht's best stated offer was $1.2 million—but that its conduct, including Schwartz never having offered more than $200,000, effectively eliminated that opportunity.  In the same vein, the factfinder could also find that the March 7, 2011 letter bespoke a willingness on Hecht's part, over a longer period, to settle Dickson's case for $1 million.  In other words, Indian Harbor cannot use its "willful failure to pursue any settlement negotiations as a shield against bad faith liability."  *New England Ins. Co.*, 295 F.3d at 247 (citing *St. Paul Fire & Marine Ins. Co.,* 43 N.Y.2d at 978–79).  The jury will be able to "draw inferences regarding lost opportunities to settle from the evidence adduced at the bad faith trial."  *New England Ins. Co.*, 295 F.3d at 247.

In sum, at this stage, there is a sufficient dispute over the element of causation to preclude entry of summary judgment for Scottsdale.  Whether or not Indian Harbor's gross disregard caused the loss of a settlement opportunity at an amount within the primary policy limit is a question properly left for the jury.

Accordingly, Scottsdale's motion for summary judgment is denied.

### C.    Indian Harbor's Motion for Summary Judgment

As the foregoing analysis reflects, Indian Harbor's cross-motion for summary judgment must also be denied.  Viewing the evidence in the light most favorable to Scottsdale, a

reasonable jury could certainly conclude both that Indian Harbor exhibited gross disregard for Scottsdale's interests, and that this gross disregard caused Indian Harbor to squander an opportunity to settle the case for $1 million or less.  Indian Harbor cites to cases in which courts have granted summary judgment to primary insurers charged with bad faith, *see, e.g.*, *Fed. Ins. Co. v. Liberty Mut. Ins. Co.*, 158 F. Supp. 2d 290, 295 (S.D.N.Y. 2001) *aff'd*, 25 F. App'x 74 (2d Cir. 2002), but those cases are not controlling given the very different facts here.  And there are more apposite cases in which courts have deferred to the jury to decide bad faith.  *See, e.g.*, *New England Ins. Co.*, 295 F.3d 232 (reversing district court's grant of the primary insurer's motion for judgment as a matter of law, and reinstating the jury verdict in favor of the excess insurer, which the court held was supported by evidence adduced at trial); *Pinto*, 221 F.3d 394 (reversing district court's grant of summary judgment, since "whether Allstate acted in bad faith in view of all the facts and circumstances, and whether it lost an opportunity to settle when liability was a foregone conclusion, were questions for a jury in this case").

Separately, Indian Harbor notes that an "insurer's rejection of a settlement offer for less than the full amount of its policy does not *by itself* establish the insurer's bad faith, even when the insured later suffers a judgment greater than the policy limit."  *K2 Inv. Grp., LLC v. Am. Guarantee & Liab. Ins. Co.,* 21 N.Y.3d 384, 391 *reargument granted*, 21 N.Y.3d 1049 (2013) (emphasis added).  That is true.  But, as the evidence reviewed above reflects, Scottsdale's claim is based on more than the fact that Indian Harbor rejected Hecht's settlement offers.  Instead, as noted, Scottsdale's claim of bad faith is also based on Indian Harbor's:  (1) inaction in the face of multiple entreaties by counsel to settle the case before and after the mediation in February 2011; (2) failure to provide its attorneys with adequate settlement authority; and (3) declination at any

point prior to Dickson's back surgery ever to offer more than the assertedly unrealistic sum of $200,000 during settlement negotiations.

Indian Harbor also argues that "in deciding whether there was any bad faith, a court should look at what the excess insurer said and did, or did not say or do." Def. Br. at 21. The Court does not disagree that Scottsdale's statements and conduct (including inaction) towards Indian Harbor, to the extent Indian Harbor had placed it on notice of developments bearing on settlement, may well be relevant evidence at trial as to whether Indian Harbor grossly disregarded the interests of its excess insurer. But New York law does not impose on the excess insurer the duty to supervise the primary insurer's handling of settlement negotiations. Rather, where a primary insurer takes responsibility for defending a case, that insurer has a duty to handle the case in good faith, a duty which may be influenced by the primary insurer's communications with the excess insurer.

*California Union Ins. Co. v. Excess Ins. Co., Ltd.*, 780 F. Supp. 1010 (S.D.N.Y. 1991), on which Indian Harbor relies, is not to the contrary. That pre-*Pavia* case acknowledged that no New York court had yet "decided whether an excess carrier may bring an action for bad faith against a primary carrier when the excess carrier knew of the latter's refusal to settle and did not object." *Id.* at 1012. The court there predicted that "a New York court would follow the trend in other jurisdictions which bar suits where the insured or excess insurer, having hired counsel to monitor the primary insurer's handling of the litigation, does not object to the primary insurer's conduct of the matter." *Id.* The New York Court of Appeals, however, in deciding *Pavia* two years later, declined to adopt such a rule. *See Pavia*, 82 N.Y.2d at 452 (a primary insurer "may be held liable for the breach of its duty of good faith in defending and settling claims over which it exercises exclusive control on behalf of its insured"). And any such rule would have limited

33

logical traction here, where there is a factual basis on which a jury could conclude that Indian

Harbor's Evans failed to alert Scottsdale to one or more $1 million all-in settlement demands by

Hecht.  This ruling, of course, does not preclude Indian Harbor from arguing to the jury at trial

that the absence of an explicit affirmative instruction by Scottsdale to Indian Harbor to settle the

case for $1 million undermines Scottsdale's claim that Indian Harbor is liable for gross

disregard.  More concretely, it is relevant to the gross disregard/good faith inquiry that Hecht

copied Scottsdale on certain communications with Evans.  Indian Harbor will be free to argue to

the jury, if the evidence supports it, that Evans took into account Scottsdale's action or lack of

action in response to such notice in deciding the appropriate settlement strategy, and that Evans

therefore did not grossly disregard Scottsdale's interests.

 Indian Harbor, finally, relies on the proposition that "an insurer's right to contest claims

applies to the damages as well as liability."  *Fed. Ins. Co.*, 158 F. Supp. 2d at 296.  But *Fed. Ins.

Co.* granted summary judgment in favor of the primary insurer, Liberty, mainly on the basis that

"Liberty's strategy of gradually increasing its offer in an effort to persuade the Garcias to lower

their demand is not an uncommon method of resolving litigation."  *Id.* at 297.  The facts here are

far afield from that.  A jury could instead find that Indian Harbor never budged from an offer of

$200,000, which became increasingly absurd, particularly once its attorneys had determined, as

early as February 18, 2011, that the case should be settled for $950,000.  This case arguably is

more like *State v. Merchants Ins. Co. of New Hampshire*, 486 N.Y.S.2d 412, where the insurance

company refused to offer more than $45,000, and in which a jury verdict against a primary

insurer was sustained.

 In sum, although there remains "a strong presumption in New York against a finding of

bad faith liability by an insurer," *see* Def. Br. 22 (citing *Hugo Boss Fashions, Inc. v. Fed. Ins.*

*Co.*, 252 F.3d 608, 624 (2d Cir. 2001)), that presumption does not invariably carry the day.

Here, Scottsdale has come forward with sufficient evidence of bad faith to permit a jury to find

that this presumption is overcome. This case must proceed to trial.

Accordingly, Indian Harbor's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are denied.

The Clerk of Court is directed to terminate the motions pending at docket numbers 58 and 69.

The Court intends shortly to set the case for a jury trial. The Court expects to schedule

trial between April 2014 and July 2014. The Court directs the parties to submit a complete—and

fully compliant—Joint Pretrial Order by February 28, 2014. *See* Individual Rules 5(A). Any

motion *in limine* is due along with the Joint Pretrial Order; any opposition to such a motion is

due March 7, 2014; replies are not invited.

So as to enable it to set a trial date, the Court also directs counsel for each side, by

January 24, 2014, to submit a joint letter: (1) identifying the witnesses that each side intends to

call at trial; (2) estimating the length of trial; (3) identifying lead trial counsel for each side; and

(4) identifying any specific dates on which lead counsel is unavailable during this period, and, as

to each such date, the specific reason for that unavailability. General statements of unavailability

will be disregarded. The Court will attempt, if possible, to accommodate counsels' schedules.

Counsel are to confer by phone by close of business on Tuesday, January 21, 2014, to share lists

of expected trial witnesses and estimates of the trial's length.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: January 16, 2014
New York, New York